## COMMONWEALTH *vs.* VALERIE WELCH.

Essex. November 1, 2004. - April 25, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Criminal Harassment. Statute,* Construction, Retroactive application. *Constitutional Law,* Ex post facto law, Freedom of speech and press. *Words,* "Conduct," "Act," "Series."

This court concluded, based on the plain language of G. L. c. 265, § 43A, its legislative history, the language and construction of related statutes, and the law of other jurisdictions, that the "conduct" or "acts" criminalized by the statute include some harassing speech [85-89]; further, this court concluded that the statute, in prohibiting a certain "pattern" of conduct or "series" of acts "directed at a specific person," requires the Commonwealth to prove that three or more occasions of harassment occurred [89-90], and that the defendant intended to target the victim with harassing conduct on those occasions [90], all of which must have occurred after the effective date of the statute [90-91].

This court concluded that at a trial on a complaint charging a defendant with criminal harassment in violation of G. L. c. 265, § 43A, the evidence offered by the Commonwealth at trial established, at most, only two incidents of harassment occurring after the effective date of the statute and therefore was insufficient to support a finding that the defendant had engaged in a "pattern" of conduct or "series" of acts violative of the statute. [91-93]

Discussion of Federal and State case law considering the constitutional limits on the criminalization of speech. [93-98]

This court concluded that the criminal harassment statute, G. L. c. 265, § 43A, which prohibits certain harassing speech, did not impermissibly criminalize speech protected under the First and Fourteenth Amendments to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights, where the statute, rather than imposing an unduly broad prohibition on all annoying or offensive speech, was closely tailored to punish only constitutionally unprotected "fighting words." [98-100]

COMPLAINTS received and sworn to in the Lynn Division of the District Court Department on March 1, 2001.

The cases were heard by *Ellen Flatley,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Richard J. Fallon* for the defendant.

*Catherine Langevin Semel*, Assistant District Attorney, for the Commonwealth.

COWIN, J. After a jury-waived trial in the District Court, the defendant, Valerie Welch, was convicted of criminal harassment pursuant to G. L. c. 265, § 43A, based on a series of homophobic statements she made over the course of more than one and one-half years to and about the complaining witnesses, Stephen Robichau and Frank Brienza.[1] The Appeals Court affirmed the defendant's convictions in an unpublished memorandum and order pursuant to its rule 1:28. *Commonwealth* v. *Welch*, 61 Mass. App. Ct. 1008 (2004). We granted the defendant's application for further appellate review. She contends that (1) there was insufficient evidence to support her convictions under the criminal harassment statute; (2) the criminal harassment statute is unconstitutionally overbroad on its face because it criminalizes speech protected under the First and Fourteenth Amendments to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights; and (3) the statute, as applied to her, violates her rights under the First and Fourteenth Amendments and art. 16. Because we conclude that the defendant's conduct does not satisfy the elements of the statute, we reverse.[2]

*Factual background.* In reviewing the sufficiency of the evidence, we consider the facts in the light most favorable to the Commonwealth. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), quoting *Commonwealth* v. *Sandler*, 368 Mass. 729, 740 (1975).

During the relevant period, the complainants Stephen Robichau

---

[1]The criminal harassment statute, G. L. c. 265, § 43A (*a*), inserted by St. 2000, c. 164, and effective October 30, 2000, provides:

> "Whoever willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person, which seriously alarms that person and would cause a reasonable person to suffer substantial emotional distress, shall be guilty of the crime of criminal harassment . . . . Such conduct or acts described in this paragraph shall include, but not be limited to, conduct or acts conducted by mail or by use of a telephonic or telecommunication device including, but not limited to, electronic mail, internet communications or facsimile communications."

[2]We deny the defendant's motion to expand the record to include a supplemental appendix.

and Frank Brienza lived together in an apartment on the third floor of a twelve-unit apartment building in Lynn, almost directly across the hall from the defendant. At the time of the incidents, Robichau and Brienza had been in an intimate relationship for over twenty years. At various times before (and possibly during) the alleged harassment, the defendant, Robichau, and Brienza enjoyed a friendly relationship, and the defendant was particularly social with Robichau. During the spring of 1999, the relationship became contentious when one of the men suspected the defendant of stealing jewelry from him. Shortly thereafter, the defendant made the first of a series of hateful and bigoted comments at or about Robichau and Brienza based on their sexual orientation. These comments (there is evidence of seven incidents in the record)[3] formed the basis of two criminal complaints filed in Lynn District Court. One complaint alleged the criminal harassment of Brienza, and a second complaint alleged the criminal harassment of Robichau.[4] We set forth the facts of the seven incidents in chronological order, noting that the first three incidents took place prior to the effective date of the criminal harassment statute, October 30, 2000. See note 1, *supra.*

The first incident occurred on May 31, 1999. While at home, Robichau and Brienza heard loud noises outside. The defendant, her former boy friend, and two other tenants were sitting in front of the apartment building drinking beer and conversing loudly. Robichau and Brienza stepped out onto their balcony and asked the group to quiet down and not to block the stairs. According to Brienza, the defendant called the plaintiffs "faggots" and "queers," and said, "Why don't you go back in the house, you fucking queers?" Robichau testified that the defendant said to him, "Shut up, you fucking fag." The two

---

[3] It is unclear precisely how many episodes of alleged harassment the judge credited, as the judge's findings note "close to a half a dozen episodes." The testimony of the complaining witnesses, which served as the basis for the findings, indicates seven in total.

[4] A third complaint alleged a civil rights violation under G. L. c. 265, § 37 ("No person . . . shall by force or threat of force, willfully injure, intimidate or interfere with . . . any other person in the free exercise or enjoyment of any right or privilege" secured by Federal or State law). This complaint also alleges one count of malicious destruction of property in violation of G. L. c. 266, § 127. The defendant was acquitted of these charges.

men telephoned the police, who came to the apartment and spoke to the defendant.

The second incident was on the following Saturday, again while both men were home. The defendant and her friend stood outside the apartment building, underneath Robichau and Brienza's bedroom window, looking up at them and yelling homophobic comments for about thirty minutes to one hour.[5] Brienza testified that the defendant called him and Robichau "faggots," "queers," and "cock suckers," and yelled, "We'll get you," and "You will pay for this." Robichau recalled the defendant yelling "we hate queers." Again, the two men contacted the police, who apparently arrived after the defendant had stopped yelling.[6]

The third incident occurred a few months later at the end of October, 1999. When Brienza returned home from work and got out of his car in the parking lot beside the apartment building, the defendant yelled from her open window on the third floor, "The queer is home now, the fucking queer is home now."

In a fourth encounter in December, 2000 (the first incident to occur after the harassment statute became effective), the defendant was talking loudly with a gentleman in the hallway outside Robichau and Brienza's apartment. Robichau poked his head out his apartment door and asked the defendant to quiet down. The defendant turned to the gentleman and said, "Oh, yeah, he's a fucking fag. Don't worry about it."

The fifth incident, on January 24, 2001, occurred when both Robichau and Brienza were home. The men overheard two or more women talking in a "normal" tone outside the building below their window, mentioning "the queers up on the third floor." Brienza heard the defendant say, "We'll get their ass. It's about time. We have to get rid of these fucking queers." Robichau heard one of the individuals (not the defendant) state, "Yeah, we'll get him. We'll fuck him up. We'll get rid of him."

[5]Robichau's testimony places this incident on May 31, 1999, the date of the first incident, but the difference in time is of no import to the present appeal and evidently did not diminish the witnesses' credibility in the eyes of the judge.

[6]The trial transcript does not indicate what action, if any, the police took on arrival.

In response, the defendant stated, "I'm on board," "We'll get rid of him." During the conversation, the defendant also used the slurs "fag," "queer," and "cock sucker."

During the sixth incident on January 26, 2001, Robichau was in his bedroom. He discovered the defendant outside, once again below his bedroom window, looking up at the window and screaming, "It's not my fault you like to take it up the ass." Robichau telephoned the police, who spoke to both parties.

In the seventh and final incident, which, the parties suggest, occurred the next day, Robichau was in his apartment when he heard the defendant yelling, "Don't worry. They're just fags. We can deal with them. I know people. I'll deal with them." The defendant was in her own apartment at the time she made these statements but was yelling loudly enough that Robichau thought she was "right outside [his] door." Robichau once again contacted the police.[7]

Robichau testified that the sum of the incidents made him "fearful," that he "is [a]goraphobic," and that "[t]he end result of this was it became nearly impossible for [him] to leave [his] apartment . . . ." The judge denied the defendant's motions for required findings of not guilty as to the harassment charges at the close of the Commonwealth's case and again at the close of all the evidence.[8]

*Discussion.* This court has not had the opportunity to consider the elements of the new criminal harassment statute, G. L. c. 265, § 43A. We first consider the nature and scope of the "pattern of conduct or series of acts" that constitutes criminal harassment. *Id.* We then consider the meaning of the statutory requirement that such conduct be "directed at a specific person," and whether harassing conduct that occurred prior to the effective date of the statute may be punishable. We apply the statute, as construed, to the defendant's conduct in the present case and conclude that there is insufficient evidence to convict. Finally, because the issue was thoroughly briefed and future application of the statute is likely to give rise to similar concerns, we discuss whether the statute, as interpreted today, is

---

[7]The transcript does not indicate if the police responded.

[8]The defendant testified, denying the comments and presenting a different version of the seven incidents. The defense also called two other witnesses. The judge did not credit the defense testimony.

consonant with our Federal and State constitutional guarantees of free speech. See *Commonwealth* v. *Gilfedder*, 321 Mass. 335, 338 (1947). See also *School Comm. of Springfield* v. *Board of Educ.*, 366 Mass. 315 (1974), cert. denied, 421 U.S. 947 (1975).

1. *Statutory construction.* We first consider whether hateful words, such as those employed by the defendant in this case, are criminalized by § 43A. We apply the general rule of statutory construction that a statute is to be interpreted "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Commonwealth* v. *Galvin*, 388 Mass. 326, 328 (1983), quoting *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975). Our starting point is therefore the plain language of the statute, see, e.g., *Simon* v. *State Examiners of Electricians*, 395 Mass. 238, 242 (1985), but we also seek guidance from its legislative history, see *Oxford* v. *Oxford Water Co.*, 391 Mass. 581, 587-588 (1984), quoting *Commonwealth* v. *Welosky*, 276 Mass. 398, 401-402 (1931), cert. denied, 284 U.S. 684 (1932), the language and construction of related statutes, see, e.g., *Boswell* v. *Zephyr Lines, Inc.*, 414 Mass. 241, 247 (1993), and the law of other jurisdictions, see, e.g., *Commonwealth* v. *Melton*, 436 Mass. 291, 296-297 (2002); *Commonwealth* v. *Donovan*, 395 Mass. 20, 29-30 (1985).

A. *Harassing "conduct" or "acts."* By its terms, the criminal harassment statute is applicable to a "knowing pattern of conduct or series of acts." However, the statute provides no definition of the terms "conduct" or "acts," nor does it indicate expressly whether such "conduct" or "acts" may include speech or statements, the "conduct" employed by the defendant in this case. "When a statute does not define its words we give them their usual and accepted meanings, as long as these meanings are consistent with the statutory purpose. . . . We derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions." *Commonwealth* v. *Bell*, 442 Mass. 118, 124 (2004), quoting *Commonwealth* v. *Zone Book, Inc.*, 372 Mass. 366, 369 (1977).

The nouns "conduct" and "act" are defined as involving intentional human behavior, and while neither word excludes the act of speaking, neither expressly embraces it. See Webster's Third New Int'l Dictionary 20 (1993) (defining "act" as, in part, "a sequence of human behavior . . . regulated by standards of conduct" and "something done by a person pursuant to his volition"); *id.* at 473 ("conduct" is, in part, "the act, manner, or process of carrying out . . . [and] a mode or standard of personal behavior esp[ecially] as based on moral principles"). The definitions of "speech" and "statement" do not resolve the ambiguity. See *id.* at 2189 ("speech" is, in part, "the act of speaking: communication or expression of thoughts in spoken words [and] a form or method of . . . communication"); *id.* at 2229 ("statement" is, in part, "the act or process of stating, reciting, or presenting orally"). While it is often possible to distinguish between speech and conduct, courts have recognized that the two concepts frequently overlap and may be incapable of precise differentiation. See, e.g., *Texas* v. *Johnson,* 491 U.S. 397, 406 (1989) (States may not proscribe certain conduct because it contains expressive elements protected by First Amendment); *Commonwealth* v. *Robicheau,* 421 Mass. 176, 182-183 (1995) (speech that places victim in reasonable apprehension of imminent serious physical harm is conduct equivalent to crime of assault and is unprotected by First Amendment); *Commonwealth* v. *Oakes,* 407 Mass. 92, 95-96 (1990) (taking nude photographs of teenager neither "pure speech" nor "merely conduct," but "mixed speech and conduct").

This apparent ambiguity in the statutory language is resolved by reference to the remaining portions of the statute. See *Commonwealth* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 352 Mass. 617, 618 (1967), quoting *Bolster* v. *Commissioner of Corps. & Taxation,* 319 Mass. 81, 84-85 (1946) ("None of the words of a statute is to be regarded as superfluous . . . so that the enactment considered as a whole shall constitute a consistent and harmonious statutory provision capable of effectuating the presumed intention of the Legislature"). See also *Kargman* v. *Commissioner of Revenue,* 389 Mass. 784, 788 (1983) ("statutes should be interpreted as a whole to

constitute a consistent and harmonious provision"); *Commonwealth* v. *Adams*, 389 Mass. 265, 273 (1983) (following "basic principle of statutory construction that a statute must be read as a whole"). The second (and only other) sentence in this paragraph of the criminal harassment statute reads: "Such conduct or acts described in this paragraph *shall include, but not be limited to*, conduct or acts conducted by mail or by use of a telephonic or telecommunication device including, but not limited to, electronic mail, internet communications or facsimile communications" (emphasis added). G. L. c. 265, § 43A (*a*). This sentence appears to demonstrate a legislative intent to encompass speech within the definition of harassing conduct or acts. It clarifies that harassing "conduct or series of acts," which otherwise meet the statutory elements, will not be exempt from punishment simply because they are conducted through certain methods of communication. *Id.* Given that the Legislature expressly articulated its intent to punish harassing words communicated through the mail and certain technological means, it follows that it contemplated that harassment could be in the form of speech. That the list of prohibited methods of communication in the statute is not exclusive further suggests that the Legislature did not intend to exempt oral communication from the statute's reach. To construe the criminal harassment statute as excluding harassing speech would ignore the impact of this second sentence and violate our principles of statutory construction. See *Wolfe* v. *Gormally*, 440 Mass. 699, 704 (2004), quoting *Bankers Life & Cas. Co.* v. *Commissioner of Ins.*, 427 Mass. 136, 140 (1998) ("basic tenet of statutory construction requires that a statute 'be construed . . . "so that no part will be inoperative or superfluous" ' ").

Our determination that the criminal harassment statute was intended to proscribe harassing conduct encompassing "speech" or "statements" gains support from the language and construction of related statutes. See *Boswell* v. *Zephyr Lines, Inc., supra* ("we must attempt to construe [a statute] in harmony with other related statutes and rules so as to give rise to a consistent body of law"). Particularly instructive to our analysis is the closely related criminal stalking statute, G. L. c. 265, § 43. The criminal harassment law was passed in response to a perceived loophole

in the stalking statute. The stalking statute expressly included within its reach "threatening" conduct or acts, but left without remedy those victims plagued by harassment that, although potentially dangerous, did not include an overt "threat" and thus was not actionable under existing law.[9] In drafting the harassment statute, the Legislature employed language nearly identical to that of the stalking statute but eliminated the threat requirement. See G. L. c. 265, § 43 (*a*).[10] The criminal stalking statute prohibits conduct or acts that include threatening speech. See, e.g., *Commonwealth* v. *Robicheau, supra* at 182-183 (upholding stalking conviction based in part on verbally threatening victim). See also *Commonwealth* v. *Matsos*, 421 Mass. 391, 394-395 (1995), quoting *Commonwealth* v. *Gordon*, 407 Mass. 340, 349 (1990) (in determining whether "threat" element of stalking violation satisfied, "court will look to the actions and *words* of the defendant in light of the attendant circumstances" [emphasis added]).

Also helpful is the definition of the term "harassment" as used in the context of sexual harassment law. It was well established at the time of this statute's passage that sexual harassment encompasses harassing speech. See, e.g., G. L. c. 151A, § 25 (defining "sexual harassment" in unemployment compensation statute as including "verbal or physical conduct of a sexual nature"); *Melnychenko* v. *84 Lumber Co.*, 424 Mass.

---

[9]See, e.g., Comments of Senator Linda Melconian, Senate Session, Jan. 27, 2000 ("Now is the time to close some loopholes . . . . It is criminal behavior to make a person live in terror and it should not matter whether or not the victim has actually received an overt threat . . . . That's why this bill is needed to create the crime of criminal harassment"); Comments of Representative Stephen Tobin, House Session, July 12, 2000 ("The thing is up to now, the stalking provision hasn't covered conduct that doesn't threaten bodily injury or harm. . . . So what we're doing today is we're creating a new provision in the general laws that would cover that"). See also Senate to Vote Today on Bill to Boost Protection of Stalking Victims, Boston Globe, Jan. 27, 2000, at B7 (harassment legislation drafted in response to high-profile victims of stalking, and considered just days after Everett woman was killed by stalker who harassed her but had not threatened her).

[10]There are other differences between the harassment statute and the stalking statute. For example, the stalking statute requires the victim be "seriously alarm[ed] or annoy[ed]," while the harassment statute requires only that the victim be "seriously alarm[ed]." The stalking statute also carries a longer maximum sentence. Compare G. L. c. 265, § 43 (stalking statute) with G. L. c. 265, § 43A (*a*) (harassment statute).

285, 290 (1997), quoting G. L. c. 151B, § 1 (18) ("Verbal or physical conduct of a sexual nature, even if it does not include 'sexual advances' or 'requests for sexual favors,' comes within the statutory definition of sexual harassment").

Finally, other jurisdictions have construed similar statutes that proscribe harassing "conduct" as encompassing speech. See, e.g., *State* v. *Cropley*, 544 A.2d 302, 304 (Me. 1988) (harassment statute prohibits harassing speech unprotected by Constitution); *State* v. *Machholz*, 574 N.W.2d 415, 420 (Minn. 1998) (harassing conduct proscribed by statute includes expressive conduct and speech); *Commonwealth* v. *Duncan*, 239 Pa. Super. 539, 543 (1976) (speech may constitute course of conduct within meaning of harassment statute). Given the second sentence in the criminal harassment statute, as well as the meaning of harassing conduct in related contexts, we conclude that the Legislature intended to include some harassing speech within the scope of the criminal harassment statute.

B. *"Pattern" or "series."* Our analysis regarding the scope of the "conduct" or "acts" that fall within the statute's reach does not end our inquiry. We have not had an occasion to consider the meaning of the words "pattern" and "series" as used in the criminal harassment statute. We determine today that the phrase "pattern of conduct or series of acts" requires the Commonwealth to prove three or more incidents of harassment for the following reasons. First, the dictionary definition of "series" is "a group of *usu[ally] three or more things or events* standing or succeeding in order and having a like relationship to each other" (emphasis added). Webster's Third New Int'l Dictionary 2072 (1993). See *Commonwealth* v. *Bell*, 442 Mass. 118, 124 (2004) (deriving meaning of statutory terms in part from dictionary definitions). Second, under the closely related criminal stalking statute, see discussion *supra*, we have required the Commonwealth to prove more than two incidents of harassment or stalking to support a conviction. See *Commonwealth* v. *Kwiatkowski*, 418 Mass. 543, 548 (1994) ("A pattern or series in the context of [stalking by harassment] would involve more than two incidents"). See also *Commonwealth* v. *Alphas*, 430 Mass. 8, 15 (1999). We can safely assume that when the Legislature enacted the criminal harassment statute it manifested

an intent that a conviction under the statute requires proof of three or more incidents.

C. *Conduct "directed at a specific person."* The statute further requires that the "pattern of conduct or series of acts" be "directed at a specific person." G. L. c. 265, § 43A (*a*). Moreover, the statute clarifies that the "specific person" referred to is the victim — the person who is "seriously alarm[ed]" by the harassment. *Id.* In short, this provision, by its plain terms, requires the Commonwealth to establish, at the very least, that the defendant intended to target the victim with the harassing conduct on at least three occasions.

D. *Prestatutory incidents.* Next we must determine whether the incidents that occurred in this case prior to the effective date of the statute, October 30, 2000, but which otherwise might meet the statutory requirements for harassing "conduct" or "acts" under G. L. c. 265, § 43A, may be considered among the three or more harassing incidents necessary to support a conviction. Our Federal and State Constitutions protect defendants against the application of ex post facto laws. See art. 1, § 10, of the United States Constitution; art. 24 of the Massachusetts Declaration of Rights ("Laws made to punish for actions done before the existence of such laws, and which have not been declared crimes by preceding laws, are unjust, oppressive, and inconsistent with the fundamental principles of a free government"). An ex post facto law is one that "makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action." *Opinion of the Justices*, 423 Mass. 1201, 1224 (1996), quoting *Calder* v. *Bull*, 3 U.S. (3 Dall.) 386, 390 (1798). See also *Collins* v. *Youngblood*, 497 U.S. 37, 42 (1990). The Commonwealth asserts that a defendant may be convicted of criminal harassment without violating the law against ex post facto punishment where the last of three or more incidents occurred after the effective date of the statute. However, to consider prestatutory incidents of harassment, separated in time and circumstance from poststatutory incidents, when determining whether a person committed three or more offensive acts, would impermissibly make criminal those incidents that were lawful when committed. See *Commonwealth* v. *Catalina*, 407 Mass. 779, 783 (1990) ("A

defendant cannot be prosecuted for an act which was not a crime when it was performed . . .").[11] Contrast *Commonwealth* v. *Corbett*, 422 Mass. 391, 394 (1996) (no ex post facto problem where defendant convicted as third-time offender based on prior convictions before effective date of statute, because defendant was punished for third crime, not prior offenses, which "related only to the punishment he received for the current offense").

Even if a consideration of prestatutory incidents would not violate the ex post facto clauses of our Federal and State Constitutions, we do not read retroactivity into criminal harassment statutes where the Legislature has indicated no intent to do so. "Absent clear language to the contrary it is presumed that legislation is not intended to operate retroactively." *Commonwealth* v. *Fuller*, 421 Mass. 400, 407-408 (1995). See *Commonwealth* v. *Davis*, 380 Mass. 1, 16 (1980) (court "does well to tread lightly" in applying statutory amendments retroactively if doing so might implicate ex post facto provisions in a Federal or State Constitution). Therefore, we do not consider prestatutory incidents among the three or more incidents of harassing conduct necessary to make up the crime of harassment.[12]

2. *Application to present case.* We now apply the statute, as construed, to the defendant's allegedly harassing conduct. In considering whether there was sufficient evidence to support a conviction under the criminal harassment statute as limited above, we must decide "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v.

[11]The Commonwealth cites *People* v. *Bastian*, 981 P.2d 203, 205 (Colo. Ct. App. 1998), for the proposition that consideration of harassing incidents that straddle the effective date of a statute do not violate the ex post facto clause. Our cases suggest the contrary. See, e.g., *Commonwealth* v. *Catalina*, 407 Mass. 779, 783 (1990).

[12]Although they may not comprise part of the pattern or series of acts, prestatutory incidents may be considered in determining whether poststatutory incidents meet the statutory elements of harassing conduct or acts (such as causing a reasonable person severe emotional distress and causing serious alarm in the victim). Prestatutory incidents may also be admitted to show intent or motive. See, e.g., *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986).

*Virginia*, 443 U.S. 307, 319 (1979). In particular, we must
determine whether the judge, who did not have the benefit of
our statutory construction, could have found beyond a reason-
able doubt that the defendant engaged in at least three incidents
of harassing conduct (here, speech) "directed at" Robichau and
Brienza, that occurred after the effective date of the statute.[13]
G. L. c. 265, § 43A (*a*). See *Commonwealth* v. *Latimore, supra.*
The judge determined that there were "close to a half a dozen
episodes" of harassment, and thus she concluded that there was
sufficient evidence to meet the statutory requirement of a "pat-
tern" of harassment. We disagree.

Of the seven incidents described in the record, the first three
occurred before October 30, 2000, the effective date of the
criminal statute, and may not be considered evidence of a "pat-
tern" of harassing conduct. See discussion, *supra.* We consider
only those four incidents that occurred after the effective date
of the statute. We begin with an analysis of the January 24 and
January 27, 2001 incidents (fifth and seventh, discussed *supra*).
The January 24, 2001, incident involved the defendant speaking
in a "normal" tone to a third party outside the building below
the complaining witnesses' window, and the January 27, 2001,
incident consisted of the defendant's yelling while in her own
apartment. Although the utterance of offensive language during
these two incidents could meet the "conduct" or "acts" require-
ment of the statute, there was insufficient evidence that these
incidents were "directed at" Robichau or Brienza. The
defendant (for unknown reasons) concedes that the January 24,
2001, incident meets the statutory requirements. However, as
we have made clear, to be consistent with the constitutional
requirements, any speech prohibited by the criminal harassment
statute must be directed at a specific person. See discussion,
*supra.* While the Commonwealth established that the offensive
language was indeed overheard by the complaining witnesses,
the record does not establish that the defendant intended the
statements to be heard by Robichau or Brienza, nor that she
should have known that the statements would be heard by them.

[13]The defendant was not convicted of any conduct or acts other than speech,
and there is no indication in the record that the defendant engaged in other
conduct encompassed by the criminal harassment statute.

The January 24 and January 27, 2001, incidents (incidents five and seven) are beyond the reach of the criminal harassment statute.

This leaves only two poststatutory incidents as a possible basis for a conviction under the harassment statute (incidents four and six), an insufficient number to meet the "pattern" or "series" requirement necessary to support a conviction. See discussion, *supra.* We therefore need not decide whether those two incidents meet the statutory elements for criminal harassment, and hold that the defendant's actions in this case, however offensive and hurtful to Robichau and Brienza, did not constitute criminal harassment within the meaning of G. L. c. 265, § 43A.

3. *Constitutional concerns.* We do not generally consider constitutional questions unless their resolution is necessary to the disposition of the controversy before us. See, e.g., *Bynum* v. *Commonwealth*, 429 Mass. 705, 710 (1999). In this case, having determined that the defendant's conduct did not meet the requisite elements of the criminal harassment statute, our inquiry may end. However, in certain limited circumstances, we have exercised our judicial discretion to consider questions of constitutional dimension even where not necessary to the outcome of a case. See, e.g., *School Comm. of Springfield* v. *Board of Educ.*, 366 Mass. 315 (1974); *Commonwealth* v. *Gilfedder*, 321 Mass. 335, 338 (1947). Several factors motivate us to address the criminal harassment statute's constitutionality in this case. The parties have fully briefed them. More importantly, the statute, as we construe it, implicates important concerns of free speech and future application of this statute will likely give rise to challenges concerning its scope. "[A] statute . . . which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." *Watts* v. *United States*, 394 U.S. 705, 707 (1969). See *Commonwealth* v. *Gilfedder, supra.*

We begin by canvassing the leading cases that have considered the constitutional limits on the criminalization of speech. Mindful of the constitutional limitations recognized by the United States Supreme Court, we analyze the criminal harassment statute, G. L. c. 265, § 43 (*a*), and conclude that it is not constitutionally infirm. We are guided in our analysis not only by decisions of the United States Supreme Court, but also by the canons of statutory

construction that require us to construe statutes, where appropriate, to avoid rendering them unconstitutional. See, e.g., *School Comm. of Greenfield* v. *Greenfield Educ. Ass'n*, 385 Mass. 70, 79 (1982); *Commonwealth* v. *Balthazar*, 366 Mass. 298, 301-302 & n.2 (1974).

Although not an absolute rule, the Supreme Court has held that States generally may not proscribe speech based on its content. See *R.A.V.* v. *St. Paul*, 505 U.S. 377, 387 (1992). At the same time, the Court has consistently recognized "certain well-defined and narrowly limited classes of speech" that, precisely because of their content, may be constitutionally prohibited. *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 571 (1942). "The First Amendment permits 'restrictions upon the content of speech in a few limited areas, which are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." ' " *Virginia* v. *Black*, 538 U.S. 343, 358-359 (2003), quoting *R.A.V.* v. *St. Paul, supra* at 382-383. "These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words," *Chaplinsky* v. *New Hampshire, supra*, words "directed to inciting or producing imminent lawless action [that are] likely to incite or produce such action," *Brandenburg* v. *Ohio*, 395 U.S. 444, 447 (1969), and "true 'threat[s].' "[14] *Watts* v. *United States, supra* at 708. "Fighting words" have been described by the Supreme Court as words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace" and words "plainly likely to cause a breach of the peace by the addressee." *Chaplinsky* v. *New Hampshire, supra* at 572, 573. The Court has also described "fighting words" as "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen* v. *California*, 403 U.S. 15, 20 (1971).

Although the United States Supreme Court has never considered the constitutionality of a criminal statute that

---

[14]The "true threats" exception is not applicable to the criminal harassment statute because the statute was enacted to criminalize those acts of harassment that do not rise to the level of threats. Contrast G. L. c. 265, § 43 (criminal stalking statute).

prohibits harassing speech, the Court has held unconstitutional several other laws aimed at proscribing conduct that might include speech, where those laws were not limited to "fighting words" or other forms of unprotected speech. See, e.g., *Madsen* v. *Women's Health Ctr.,* 512 U.S. 753, 773-774 (1994) (provision of injunction creating health clinic buffer zone that prohibited petitioners from physically approaching persons seeking services "unless such person indicates a desire to communicate," unconstitutional as limiting speech beyond "fighting words" or threats; some other provisions upheld); *Houston* v. *Hill,* 482 U.S. 451, 462-463, cert. denied, 483 U.S. 1001 (1987) (municipal ordinance that made it unlawful to interrupt a police officer in the performance of his or her duties overbroad because not limited to "fighting words"); *Lewis* v. *New Orleans,* 415 U.S. 130, 131-132 (1974) (overturning city ordinance that proscribed "wantonly . . . curs[ing,] revil[ing,] or us[ing] obscene or opprobrious language . . . to any member of the city police"); *Gooding* v. *Wilson,* 405 U.S. 518, 519, 528 (1972) (striking down statute that forbade use "of opprobrious words or abusive language, tending to cause a breach of the peace" because not sufficiently narrowed by State courts and not limited to "fighting words"). Likewise, this court has recognized, after reviewing the teachings of the Supreme Court concerning the regulation of "abusive, offensive, profane or opprobrious language," that "a statute seeking to regulate what we have broadly termed offensive speech will stand only if that statute . . . is so narrowly drawn as to be limited to 'fighting words.' " *Commonwealth* v. *A Juvenile,* 368 Mass. 580, 589 (1975), quoting *Chaplinsky* v. *New Hampshire, supra* at 571-572. This remains true today, although we note that "fighting words" are not the only category of unprotected speech that may be regulated consonant with the First Amendment. See *Commonwealth* v. *Robicheau,* 421 Mass. 176, 182 (1995) (" 'Fighting words' " . . . are not the only type of expression for which the protections of the First Amendment do not extend"). See also *Brandenburg* v. *Ohio, supra*; *Watts* v. *United States, supra*; *Chaplinsky* v. *New Hampshire, supra.*

Guided by Federal case law, some State courts have held unconstitutional statutes outlawing harassing conduct or speech

precisely because those statutes proscribe behavior that does not
rise to the level of "fighting words" or "true threats." For
example, the Supreme Court of Washington in *State* v. *Williams*,
144 Wash. 2d 197, 208-209 (2001), found constitutional defects
in a criminal harassment statute that included threats "to do any
other act which is intended to substantially harm the person
threatened . . . with respect to his or her . . . mental health or
safety" because it was not limited to "true threats" or "fighting
words." The court ultimately struck the term "mental" from the
statute in order to save it. *Id.* at 212-213. Similarly, the Supreme
Court of Minnesota, in *State* v. *Machholz*, 574 N.W.2d 415,
417-418 (Minn. 1998), overturned a harassment statute that
proscribed "intentional conduct" that causes "a reasonable
person . . . to feel oppressed, persecuted, or intimidated,"
including "harassing conduct that interferes with another person
or intrudes on the person's privacy or liberty." The court
determined that the statute could not be construed as applying
only to "fighting words." *Id.* at 420. The Supreme Court of
Iowa, in *State* v. *Fratzke*, 446 N.W.2d 781, 784 (Iowa 1989),
noted that "in order to uphold the constitutionality of a state
statute that attempts to criminalize the use of opprobrious words
or abusive language the statute must, by its own terms or as
construed by the state's courts, be limited in its application to
'fighting words' and must not be susceptible of application to
speech that is protected by the [F]irst and [F]ourteenth
[A]mendments." *Id.* (reversing conviction for harassment based
on insufficient evidence). Statutes that employ broad terms such
as "alarming" or "annoying" to define harassing conduct or
speech have been of particular concern to many State courts.
See, e.g., *Bolles* v. *People*, 189 Colo. 394, 397-398 (1975)
(harassment statute unconstitutionally overbroad because it
requires intent to "harass, annoy, or alarm another person,"
which extends beyond fighting words and other unprotected
categories of speech); *Long* v. *State*, 931 S.W.2d 285, 289, 297
(Tex. Crim. App. 1996) (stalking statute that prohibits com-
munication by telephone or in writing in coarse and offensive
manner with intent to "annoy[] or alarm[]" is unconstitutionally
vague); *Everett* v. *Moore*, 37 Wash. App. 862, 864-866 (1984)
(city ordinance criminalizing harassment overbroad and vague

in large part due to its prohibition of speech which "alarms or seriously annoys").

Other States, however, have construed their statutes that proscribe harassing conduct or speech as constitutionally permissible. Most commonly, statutes have been upheld that contain some combination of the following limiting characteristics: a "willful," "malicious," or specific intent element; a requirement that the conduct be "directed at" an individual; a reasonable person standard; a statutory limitation that the conduct have "no legitimate purpose"; and a savings clause excluding from the statute's reach constitutionally protected activity or communication. See, e.g., *State* v. *Brown*, 207 Ariz. 231, 233, 235 (Ct. App. 2004) (harassment statute upheld that includes verbal communication "directed at a specific person which would cause a reasonable person to be seriously alarmed, annoyed or harassed and the conduct in fact seriously alarms, annoys or harasses the person" and excludes "otherwise lawful demonstration, assembly or picketing"); *Bouters* v. *State*, 659 So. 2d 235, 236-237 (Fla. 1995) (stalking statute constitutional where it defined "harasses" as engaging in a course of conduct which is directed at a person, is wilful and malicious, causes substantial emotional distress, serves no legitimate purpose, and does not include constitutionally protected activity); *State* v. *Button*, 622 N.W.2d 480, 482, 485 (Iowa 2001) (harassment statute that includes "oral communication" "inten[ded] to threaten, intimidate, or alarm" upheld due to "constitutional safety valve" that harassing conduct be done "without legitimate purpose"); *State* v. *Asmussen*, 668 N.W.2d 725, 729-731 (S.D. 2003), cert. denied, 541 U.S. 907 (2004) (stalking statute constitutional even though it expressly included "verbal . . . communication" where statute required behavior be wilful, malicious, directed at a particular person, and serve no legitimate purpose); *Luplow* v. *State*, 897 P.2d 463, 465, 467-468 (Wyo. 1995) (statute constitutional that includes verbal communication but is limited to conduct directed at a person; that would cause a reasonable person substantial emotional distress; does cause serious alarm; and does not include lawful demonstration, assembly, or picketing). The inclusion of broad "savings clauses" that except constitutionally protected speech

from punishment have been of particular significance to many State courts in upholding these statutes. See, e.g., *Staley* v. *Jones*, 239 F.3d 769, 782-783, 793 (6th Cir. 2001) (upholding conviction based on Michigan stalking statute that excluded from definition of "harassment" any "constitutionally protected activity or conduct that serves a legitimate purpose"); *People* v. *Shack*, 86 N.Y.2d 529, 535 (1995) (upholding aggravated harassment statute that criminalizes only those telephone calls made "with no purpose of legitimate communication"); *Bouters* v. *State*, *supra* at 236 (harassing conduct must "serve[] no legitimate purpose" and excludes "constitutionally protected activity"); *Luplow* v. *State*, *supra* at 465, 467 (statutory exception for "an otherwise lawful demonstration, assembly or picketing" "disposes of any contention that the statute affects constitutionally protected conduct"). But see *State* v. *Machholz*, *supra* at 421 n.4 (savings clause stating that criminal harassment statute excluded harassing conduct that is constitutionally protected was insufficient); *Long* v. *State*, *supra* at 295 (statutory clause stating that stalking statute does not apply to constitutionally protected activity did not save otherwise invalid statute).

Considering these constitutional restrictions and benefiting from the law of other jurisdictions, we now consider the constitutionality of G. L. c. 265, § 43A, as interpreted today. It goes without saying that the criminal harassment statute cannot be applied to punish constitutionally protected speech. See, e.g., *Commonwealth* v. *A Juvenile*, 368 Mass. 580, 585 (1975). However, in crafting the criminal harassment statute, the Legislature appears to have had these constitutional limitations in mind. Rather than imposing an unduly broad prohibition on all annoying or offensive speech, the Legislature more narrowly drafted the criminal harassment statute. By its terms, the statute applies only to harassment that is (1) "willful[]" and "malicious[]"; (2) a "pattern" or "series" (which we construe to mean at least three acts); (3) "directed at a specific person"; (4) causes "serious[] alarm [to] that person"; and (5) "would cause a reasonable person to suffer substantial emotional distress." G. L. c. 265, § 43A (*a*). To the extent the statute implicates harassing speech, it appears intended to reach primarily what would be considered

"fighting words." For example, the requirement that the harassment must be "directed at specific persons" comports with the rule that where words are not "directed to the person of the hearer" and "[n]o individual actually or likely to be present could reasonably . . . regard[] the words . . . as a direct personal insult," even offensive words are not "fighting words." *Cohen* v. *California*, 403 U.S. 15, 20 (1971), quoting *Cantwell* v. *Connecticut*, 310 U.S. 296, 309 (1940). This court has similarly recognized that "[i]n order to be personally abusive [i.e., "fighting words,"] the words must be 'directed to the person of the hearer' in the sense that they are a face to face personal insult." *Commonwealth* v. *A Juvenile, supra* at 591, quoting *Cantwell* v. *Connecticut, supra*. Thus, "[v]ulgar, profane, offensive or abusive speech is not, without more, subject to criminal sanction . . . ." *Commonwealth* v. *A Juvenile, supra* at 589. Likewise, the "serious[] alarm[]" and "substantial emotional distress" requirements are closely tailored to punishing only "fighting words," which are words that "by their very utterance inflict injury." *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 572 (1942).

The elements set forth in § 43A are very similar to those that have led courts in other jurisdictions to uphold their statutes. See discussion, *supra*. By contrast, however, the Massachusetts criminal harassment statute lacks a savings clause or other provision that restricts punishable conduct to that which is constitutionally unprotected. Similarly, it contains no express limitation to fighting words. Nonetheless, we believe the Legislature, in carefully crafting the statute, intended the statute be applied solely to constitutionally unprotected speech. Any attempt to punish an individual for speech not encompassed within the "fighting words" doctrine (or within any other constitutionally unprotected category of speech) would of course offend our Federal and State Constitutions.[15] We decline to narrow the statute by engrafting onto it a savings clause or other limiting

[15]We do not suggest that incidents of harassment that consist of more than pure speech should be exempted from punishment merely because they are accompanied by protected speech. See *Cox* v. *Louisiana*, 379 U.S. 559, 563 (1965), quoting *Giboney* v. *Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in

construction at this time. Should the Commonwealth attempt to prosecute an individual for speech that is constitutionally protected, we would have no hesitation in reading into the statute such a narrowing construction to ensure its application only to speech that is accorded no constitutional protection.[16]

In upholding the statute's constitutionality, we effectuate the legislative intent, consistent with both the statutory language and its greater purpose. Our decision also comports with our canons of statutory interpretation that require we presume statutes to be constitutional, see, e.g., *Leibovich* v. *Antonellis*, 410 Mass. 568, 576 (1991), and construe statutes narrowly against the Commonwealth. *Weld for Governor* v. *Director of the Office of Campaign & Political Fin.*, 407 Mass. 761, 766 (1990), citing *Commonwealth* v. *Rhodes*, 389 Mass. 641, 646-647 (1983). See also *Commonwealth* v. *Donovan*, 395 Mass. 20, 29 (1985); *Commonwealth* v. *Marrone*, 387 Mass. 702, 707 (1982).

The Legislature drafted the criminal harassment statute to extend protections to victims of harassment, providing a remedy to victims before "nonthreatening" harassment escalates into life-threatening assault. Our statutory interpretation today effectuates this intent by protecting victims from harassment that may begin with words, but tragically end with violence. See Kirkman, Every Breath You Take: Massachusetts Steps up its Efforts to Stop Stalkers, 85 Mass. L. Rev. 174, 181, 183 (2001) ("stalkers who become lethal move from non-threatening behavior to direct threats and property destruction" and "criminal harassment law establishes a continuum along which law enforcement may confront stalking behaviors").

---

part initiated, evidenced, or carried out by means of language, either spoken, written, or printed").

[16]This court has narrowly construed statutory language in the past to avoid constitutional problems. See, e.g., *Commonwealth* v. *Templeman*, 376 Mass. 533, 538 (1978) (limiting "lewd, wanton and lascivious persons" provision of G. L. c. 272, § 53, to exclude application to "speech or expressive conduct or to activities which involve lawful exercise of a First Amendment right"); *Commonwealth* v. *Balthazar*, 366 Mass. 298, 302 (1974) (narrowing "unnatural and lascivious act" provision of G. L. c. 272, § 35, to avoid unconstitutionality). See also *Commonwealth* v. *Chou*, 433 Mass. 229, 233 (2001); *Commonwealth* v. *Sefranka*, 382 Mass. 108, 118 (1980); *Commonwealth* v. *A Juvenile*, 368 Mass. 580, 597 (1975).

*Conclusion.* Without question, the defendant's statements in the present case were hateful, bigoted, and highly offensive. Moreover, that Robichau and Brienza suffered anguish and distress as a result is understandable. The Legislature carefully crafted the harassment statute so as to criminalize only three or more incidents of harassment "directed at a specific person." G. L. c. 265, § 43A (*a*). The Legislature, however, acted after some of the offensive conduct in this case had occurred. We cannot punish behavior where the Commonwealth has failed to prove it meets all of the statutory elements. Accordingly, we reverse the defendant's convictions and order the complaints dismissed.

*So ordered.*