Murtagh, Thomas R., J.
The plaintiff, Charles Balyozian d/b/a The Auction Authority (“Balyozian”), entered into a contract with the defendant, the City of Somerville (“City”), to auction a parcel of property then owned by the City. Prior to the auction date, the City terminated Balyozian’s contract and sold the property to an outside buyer procured by the City. Currently *304 before this court is Balyozian’s motion for judgment on the case stated. For the following reasons, the plaintiffs motion is DENIED.

BACKGROUND

As a prefatory note, this dispute comes before the court on a case stated. I have therefore taken the following facts, together with reasonable inferences I draw therefrom, from the parties’ Agreed Statement of Facts and supporting documentation. Murphy v. Boston, 337 Mass. 560, 561 (1958); Radford Trust v. First Unum Life Ins. Co., 321 F.Sup.2d 226, 240 (D.Mass. 2004).
In January 2005, the City issued a Request for Proposals (“RFP”) for the acquisition and development of City properly formerly used as a school. The Ciiy’s intention was to use the sale proceeds to balance the Ciiy’s budget for the fiscal year ending June 30, 2005. Among other information, the RFP informed potential buyers that the property’s fair market value and minimum purchase price was $ 1,270,000, that the closing was to take place on April 29, 2005, and that “time [was] of the essence.” Furthermore, the RFP requested that the potential buyer be willing to execute a Land Disposition Agreement (“LDA”) within three business days of being selected by the City.
The City received two proposals on February 25, 2005. The proposals, one from Peter Miller and Kevin Douglas (“Miller/Douglas”) and one from Brooks Mostue, each offered a purchase price of $1,275,000 and otherwise conformed to the RFP’s stipulations, including an agreement to execute the LDA. The City selected the Miller/Douglas proposal for various financial and aesthetic reasons and requested Miller/Douglas to execute the LDA within the three allotted days. However, the deal was never completed as Miller/Douglas failed to execute this agreement. As a result, the Cily decided to sell the property by way of auction.
On April 11, 2005, the City issued a Request for Price Quotation (“RPQ”) for Auctioneer Services to three entities, one of which was Balyozian. The RPQ informed the entities of the property’s market value and instructed the minimum bid to be $990,000. The RPQ also notified the potential auctioneers that the auction date was to be May 20, 2005 and that the closing was to be completed within 30 days of the auction. On April 13, 2005, Balyozian submitted a proposal to the City. His proposal provided that he would charge the City not more than $9,375 in advertising and promotional costs and “will charge a 3% Buyer’s Premium to [the] high bidder.”
The City accepted Balyozian’s proposal and entered into an auction contract with him for a stated period of April 21, 2005 to July 1, 2005. There was an understanding between the parties that the Miller/Douglas entity, whose failed purchase was known to Balyozian, would be prohibited from bidding at the auction.[1] With the terms in place, Balyozian commenced his duties by placing advertisements in local papers, preparing bid packages, and arranging for the arrival of numerous prospective bidders at the site inspection. The City paid Balyozian $9,375 in accordance with its contractual obligations for his advertising and promotion costs.
On May 16, 2005, Miller/Douglas informed the City that it was now willing to execute the LDA. The parties executed the document on May 18, 2005, two days prior to the scheduled auction. The executed LDA required Miller/Douglas to pay $1,275,000 as abase purchase price and an additional $12,000 representing the costs associated with the previously scheduled auction. The closing date was set for June 9, 2005.
Due to the impending sale, the City informed Balyozian that the auction was postponed until the middle of June. Balyozian, through his counsel, informed the City that he was ready, willing, and able to perform the auction despite the postponement and that he was planning to conduct it on May 20, 2005 in accordance with his contractual obligations. Citing Balyozian’s intentions, the City terminated his contract on May 19, 2005, one day before the original auction date. The sale to Miller/Douglas closed as scheduled.
Balyozian thereafter filed suit against the City in this court seeking to be paid its 3% commission for the sale of the property. Balyozian alleges that the City breached its contract and thereby prohibited him from receiving the commission he otherwise would have received if a sale had been conducted through the auction.

DISCUSSION

As there are no material facts in dispute on the basis of a case stated, this court is left to determine whether Balyozian is entitled to a judgment as a matter of law. Radford Trust, 321 F.Sup.2d at 240.
1. Breach of Contract
Balyozian first alleges that the City breached the auction contract by terminating it prior to the auction date, selling the property on its own, and refusing to award him his 3% commission. Unsurprisingly, the City argues that it properly terminated the contract and is not liable for Balyozian’s commission. Although the City sent Balyozian a termination letter the day before the auction, the issue before the court does not revolve around this fact. In actuality, that letter is meaningless. When the City contracted to sell the property to Miller /Douglas, it effectively terminated the contract by rendering Balyozian’s performance impossible. Therefore, the issue is whether the City could sell the property to Miller/Douglas and not be bound by the contract entered into with Balyozian.
In support of his argument, Balyozian likens his contract to a definite term employment contract. In a standard term employment contract, one party may validly terminate the contract upon one of three con *305 ditions: (1) natural expiration of the stated term; (2) material breach by the opposing party; or (3) proper exercise of an express contractual provision permitting premature termination. See Kravetz v. Merchants Distribs., Inc., 387 Mass. 457, 460 (1982) (premature termination of an employee breached definite term contract); G.M. Abodeely Ins. Agency v. Commerce Ins. Co., 41 Mass.App.Ct. 274, 278 (1996) (“It is well established that a material breach by one party excuses the other party from further performance under the contract’’); Dickson v. Riverside Iron Works, Inc., 6 Mass.App.Ct. 53, 57 (1978) (employment contract breached by terminating employee not in accordance with specified terms). The face of Balyozian’s contract did set forth a “contract period” of April 21, 2005 to July 1, 2005 and there is no dispute that Balyozian was terminated prior to its natural expiration without a material breach by him or the City’s proper exercise of an express contractual provision.
However, the auction contract cannot be compared to a standard employment term contract. An employment contract typically calls for the rendering of services on a steady basis for a finite amount of time. The employee performs the service from the inception of the contract until the last date specified. If the employee were to stop performing his duties prior to that time, a breach would occur. This is not the type of contract to which Balyozian was bound. While it may be inferred that Balyozian would continue to provide his services throughout the auction process, a successful auction would relieve Balyozian of his duties. As a result, assuming the auction was completed on the originally scheduled date of May 20, 2005, Balyoz-ian would have fulfilled his contractual obligations more than one month prior to its natural expiration date. This type of contract is therefore more akin to a “project contract” whereby one party must fulfill his obligations by a certain date rather than through that date. Accordingly, Balyozian’s appeal to standard employment law doctrines are inapposite to the present case.
What is relevant to this case is whether Balyozian’s contract provided him with the exclusive right to sell the property. As a matter of common law, an auctioneer who does not hold an exclusive right to sell another’s property cannot recover his commission if the owner withdraws the property from the auction, although he may recover his expenses and a reasonable compensation for his services. Greer v. Arnold, 633 S.W.2d 75, 77 (Ky.App. 1982). The doctrine’s foundation is that the selling agent does not earn her commission unless she has been the “efficient” or “predominating” cause of a sale of property, not merely a “contributing” cause. Julius Tofias & Co. v. John B. Stetson Co., 19 Mass.App.Ct. 392, 395 (1985). Therefore, the commission is not due until the sale closes so that the commission can come from the proceeds of the sale and can then be allocated to the proper “efficient” and “predominating” agent. Brustin v. Lodge Corp., Civil. No. 96-1140 (Worcester Super.Ct. Mar. 24, 1998) (Gants, J.) [8 Mass. L. Rptr. 283).
Even with an exclusive agency, a seller may revoke the contract without incurring liability for the commission if the agent was not the “efficient cause of the sale.” Pasquale v. Shore, 343 Mass. 239, 246 (1961). Courts will order the seller to pay a commission to a broker who was not the efficient cause of the sale only when: (1) the seller has agreed to list the property exclusively with the agent; (2) the agreement gives the agent the “exclusive right of sale,” i.e., it obligates the seller to pay the agent a commission if the properly is sold within the fixed period of time regardless of whether the broker played any role in its sale; and (3) these terms are made expressly, unambiguously, and specifically. Bump v. Robbins, 24 Mass.App.Ct. 296, 303-05 & n.6 (1987); Brustin, Civil No.96-1140 at *5.
A clause in Balyozian’s contract states that “(t]here will be no charge other than advertising and promo(tion) if property does not sell.” Balyozian argues that this language entitles him to receive his commission if the property was sold by anybody during the time of his contract, an interpretation which would support its exclusivity. Given the fact that non-exclusive real estate brokers are entitled to their commission only if they are the “efficient” and “predominant” cause of the sale, a contextual interpretation of that clause suggests that it was inserted in the contract in order to solidify the understanding that Balyozian would not receive a commission unless he was successful in auctioning the property. If the parties intended for Balyozian to receive a commission when he was not the efficient cause of the sale (i.e., he did not sell the properly at auction), they are required to “expressly and unambiguously indicate such an intent in the contract.” Bump, 24 Mass.App.Ct. at 304. The clause at issue falls far short of this standard.
Furthermore, there is no clause prohibiting the City from resuming discussions with outside bidders, one that presumably would have been agreed to had the challenged clause entitled Balyozian to some kind of exclusive right. Its absence is especially noteworthy given the fact that Balyozian knew of Miller/Douglas’s near purchase. Indeed, the only evidence even hinting at granting him an exclusive right is the unexplained presence of one incomplete document buried amid a pile of contractual documents submitted to this court. That document, however, is printed on Balyozian’s letterhead and is left undated and unsigned by either party. Its presence as an operative document was never even argued at the hearing. While this document may reveal Bafyozian’s desire to enter into such an arrangement, it certainly does not lend support to the argument that it was in fact ever agreed to. In fact this document suggests quite the opposite. It exposes Balyozian’s understanding that specific language of exclusivity must be included in the contract in order *306 for an auctioneer to obtain the exclusive right to sell the property and exclude the owner from doing so.
Neither does Balyozian receive support from the fact that the contract was to naturally expire on a certain date. When interpreting the duration of a contract, it is proper to refer to the nature of the employment and the parties’ situation in addition to the express contractual language. Mahoney v. Hildreth & Rogers, 332 Mass. 496, 498 (1955). Here, the City’s primary motivation for selling the property was to balance the budget for the fiscal year ending on June 30, 2005. The City recognized that a sale not completed by that date would no longer serve its primary goal of balancing the budget and did not want or need the services of Balyozian, or any other auctioneer, after that date. As a result, the City engaged Balyozian’s services up until July 1, 2005 only. The attendant circumstances present indicate that the “contract period” was not intended to confer the right of exclusivity upon Balyozian. Rather, the contractual period provided in Balyozian’s contract simply limited his authority. Accordingly, the contract was non-exclusive.
In fact, this case is virtually indistinguishable from Greer, 633 S.W.2d at 77. In Greer, the defendant-seller entered into an auction contract with the plain tiff-auctioneer which indicated that the defendant’s house was to be sold, when the auction was to take place, and the amount of the commission the plaintiff would earn. One week later, the defendant gave a real estate company the exclusive right to sell the same house. When the house was sold through the real estate company, the auctioneer filed a lawsuit seeking his commission. Finding that a non-exClusive contract existed between the defendant and the plaintiff, the court held that the auctioneer was not entitled to his commission. Id. Like the auctioneer’s contract in Greer, Balyozian’s contract did not imply any right to exclusivity. As a result, the common law dictates that he is not entitled to his commission.[2]
2. Good Faith
Balyozian next alleges that the City’s termination of his contract constituted bad faith and entitles him to damages.
The covenant of good faith and fair dealing is implied in every contract. Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991). Primarily, itis the understanding between the parties that neither party will do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Id. Its purpose is to “guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.” Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004).
Balyozian argues that canceling the auction just prior to its scheduled date suffices to meet this standard because the City effectively deprived him of his opportunity to earn his commission. This court disagrees. As noted above, the covenant of good faith is implied in order to protect the parties’ expectations. Id. Balyozian and the City entered into a nonexclusive auction contract. As previously discussed, owners submitting their property to non-exclusive auctions are entitled to withdraw their property without incurring liability for the auctioneer’s commission. Greer, 633 S.W.2d at 77. Balyozian therefore entered into a contract in which the complete performance of either parties’ duties was contingent on whether the property remained on the auction table on the scheduled date. As a result, any expectation Balyozian may have held with regard to the certainty of the impending auction was unjustified and legally unsound. This court cannot find bad faith in such an action.
3. Contract Validity
As noted above, the City contends that the contract is invalid as it was entered into in violation of the Uniform Procurement Act, G.L.c. 30B, §5 (“UPA”). With some exceptions, the UPA governs all contracts entered into by a governmental body for the procurement and disposal of supplies, services, or real property. G.L.c. 30B, §1(a). If the contract price is greater than $5,000 but less than $25,000, then the procurement officer must seek price quotations from no less than three persons and shall award the contract to the individual offering the needed quality at the lowest price. G.L.c. 30B, §4(a) and (b). A supplies or services contract amounting to $25,000 or more, however, must conform to a detailed competitive sealed bidding process. G.L.c. 30B, §5(a). The purpose of a procurement statute like Chapter 30B serves the dual goal of obtaining the most favorable contract while preventing favoritism in the public sector. Cataldo Ambulance Serv., Inc. v. Chelsea, 426 Mass. 383, 389 (1998); Phipps Products Corp. v. Massachusetts Bay Transp. Auth., 387 Mass. 687, 691-92 (1982). As a result, any contract entered into in violation of the statute’s mandates is void and unenforceable. Sciaba Constr. Corp. v. Boston, 35 Mass.App.Ct. 181, 185 (1993); G.L.c. 30B, § 17(b).
There is no question that the City’s procurement of Balyozian’s services was subject to Chapter 30B’s protocols and that the City complied with the procedures for procuring a contract for less than $25,000. The dispute centers around whether the contract was actually subject to the competitive sealed bidding processes established for contracts meeting or exceeding the $25,000 threshold, a procedure not complied with in the present case. If so, Balyozian may not enforce the contract.
Unfortunately, previous case law offers little guidance. Whether a contract exceeds the $25,000 figure is typically a question easily resolved from the face of the contract, resulting in no reported cases on the proper construction and application of this statutory amount. Indeed, the face of this contract reveals that the City was to pay Balyozian $9,375 for his services *307 while he was to receive a 3% commission from the eventual purchaser. A straight-forward and completely sensical interpretation of this contract would suggest that it falls far below $25,000 because the City’s treasury would be obligated to pay less than $10,000 from its own coffers. However, eyeing the contract from an economic perspective suggests that the practical effect of the agreement was to possibly burden the City by more than $25,000. The minimum purchase price for the auctioned property was to be $990,000. Therefore, Balyozian was to receive a minimum commission of $29,700. Requiring the purchaser to pay his commission would theoretically reduce the buyer’s purchase price by the same amount in order to ensure that he was paying market value. The transaction as a whole could therefore be interpreted as exceeding $25,000, bringing it within the competitive sealed bidding processes and invalidating the contract for its procedural violation.
This issue is primarily one of statutoiy construction. Generally, a statute is to be interpreted in accordance with the intent of the Legislature. Commonwealth v. Welch, 444 Mass. 80, 85 (2005). “The primaiy source of insight into the intent of the Legislature is the language of the statute.” Commonwealth v. Clerk-Magistrate of the West Roxbury Div. of the Dist Ct. Dept. 439 Mass. 352, 355-56 (2003). In deciphering the intent, a court “may not add words to a statute that the Legislature did not put there.” Id. We therefore begin with the plain language of the statue.
Chapter 30B’s plain language indicates that the Legislature intended the statutoiy amount to be decided by the contract’s total economic impact. In relevant part, it states, “(A]ward of procurement contracts in the amowxt of $25,000 or more, other than contracts for the procurement of real property, shall conform to the competitive sealed bidding procedures set forth in this section.” G.L.c. 30B, §5(a) (emphasis supplied). The Legislature’s use of the word “amount” is significant. It means “the whole effect, substance, quantity, import, result, or significance” of the transaction. Black’s Law Dictionary (6th Ed. 1990). When read in conjunction with the UPA, it signifies to this court that the Legislature intended for the relevant statutoiy figure to be determined by the “whole effect” of the contract; that is, by taking into consideration the total economic impact of the proposed agreement as compared to only the face dollar amount.
This result squares well with the UPA’s dual purpose of obtaining the most favorable contract while preventing favoritism from seeping into the public sector. If the statutoiy threshold were to be determined by the contract’s face dollar amount, then a municipality could utilize a commission-shifting contract (assuming §30B allows split arrangements at all) to skirt the UPA’s mandates. For example, assume a town received three proposals for the auctioning of a parcel of $2 million property and each proposal charged the town a flat advertising and promotion fee of $10,000 with a commission to be paid by the purchaser. One bid proposed a 3% commission, another proposed 4%, and the third proposed a 5% rate. If the statutoiy amount were to be determined by reference to the face value only, then the contracts would be equivalent in nature and the procurement officer would be free to accept the 5% proposal, obviously benefiting the purchaser who is set to receive the largest commission. If, however, the statutoiy amount were to be determined with regard to the overall value of the contract, the procurement officer would be bound to accept the bid proposing a 3% commission. Creating a situation whereby the municipaliiy could lawfully award the contract to the 5% bidder not only opens the door for the potential to succumb to the temptations of favoritism but also may result in a less favorable contract for the municipality should a substantial portion of the commission to be paid result in a greater decrease of the purchase price.
Therefore, in light of both the language deliberately used by the Legislature and the purposes underlying the UPA, this court holds that the statutoiy threshold is determined by reference to the overall economic value of the contract. As a result, this court finds that the contract in question exceeded $25,000 and was subject to the competitive sealed bidding processes established in G.L.c. 30B, §5. There is no dispute that the City did not engage in these processes. Accordingly, the auction contract entered into by Balyozian is unenforceable and he is not entitled to receive a commission from the sale of the property to Miller / Douglas.[3]

ORDER

For the foregoing reasons, it is hereby ORDERED that the plaintiffs motion for judgment on the case stated is DENIED. Accordingly, this court enters judgment for the defendant.

Mostue, the other entity who originally bid on the property, was also excluded from bidding at the auction.

In seeking only his commission, Balyozian does not alternatively seek to recover a reasonable compensation for the services he rendered. This court therefore assumes that this compensation was presumptively included in the flat fee already paid by the City.

Balyozian urges this court to find that the contract is enforceable because a “municipality cannot retroactively ‘manufacture’ an ‘illegal’ contract defense by pointing to its very own conduct in breaching an otherwise valid contract.” His argument fails insofar as he is arguing that the City is estopped from now denying the contract’s validity. In oft-repeated holdings, the Supreme Judicial Court has consistently said that “persons dealing with a municipality must take notice of limitations [ ] upon the contracting power of the municipality and are bound by them and cannot recover upon a contract attempted to be made in violation of them.” Massachusetts General Hosp. v. Revere, 385 Mass. 772, 775 (1982).