NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11799


COMMONWEALTH  vs.  MICHAEL WALTERS.



Bristol.     May 4, 2015. - September 18, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.


Stalking.  Criminal Harassment.  Abuse Prevention.  Perjury.
    Social Media.  Threatening.  Evidence, Threat, Intent,
    Photograph, Relevancy and materiality, Argument by
    prosecutor, Disclosure of evidence.  Constitutional Law,
    Freedom of speech and press.  Intent.  Practice, Criminal,
    Instructions to jury, Argument by prosecutor, Disclosure of
    evidence, Impeachment by prior conviction.  Due Process of
    Law, Disclosure of evidence.  Witness, Impeachment.




Indictments found and returned in the Superior Court
Department on March 28, 2011.

The cases were tried before E. Susan Garsh, J.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


Ethan C. Stiles for the defendant.
David B. Mark, Assistant District Attorney (Shoshana Stern,
Assistant District Attorney, with him) for the Commonwealth.
The following submitted briefs for amici curiae:
Claire Laporte, Marco J. Quina, Rebecca M. Cazabon, Stephen
T. Bychowski, & Bendan T. Jarboe for Domestic & Sexual Violence
Council, Inc., & others.

Helen Gerostathos Guyton, Sandra J. Badin, Lyzzette M. Bullock, & John Nucci for Jane Doe Inc. & others.

Steven M. Freeman, Lauren A. Jones, & Melissa Garlick, of New York, & Joseph Berman for Anti-Defamation League.

Kirsten V. Mayer, Kavitha A. Mecozzi, Jennifer S. Pantina, Alexandra L. Roth, Matthew R. Segal, Jessie J. Rossman, & Mason Kortz for American Liberties Union of Massachusetts.

BOTSFORD, J.  This case raises the question whether a posting to the Web site Facebook may constitute a threat within the meaning of the stalking statute, G. L. c. 265, § 43 (a) (§ 43 [a]).  We conclude that although content posted to Facebook may qualify as a threat as defined in the statute, in this particular case, a reasonable jury could not have found that the defendant's Facebook profile page constituted such a threat.  We therefore vacate the defendant's conviction of stalking.  The defendant's remaining convictions of criminal harassment, criminal violation of a restraining order pursuant to G. L. c. 209A, § 7 (two counts), and perjury (two counts) are affirmed.[1]

---

[1] We acknowledge the amicus briefs submitted by the Domestic & Sexual Violence Council, Inc., Foley Hoag Domestic Violence and Sexual Assault Prevention Project, Massachusetts Law Reform Institute, Victim Rights Law Center, Community Legal Services and Counseling Center, Greater Boston Legal Services, Domestic Violence Institute at Northeastern University School of Law, Family Advocacy Clinic of Suffolk University Law School, Justice Center of Southeast Massachusetts, and Community Legal Aid; Jane Doe Inc., the Women's Bar Association of Massachusetts, the Women's Bar Foundation, the National Network to End Domestic Violence, and the National Center for Victims of Crime; the

Background. 1. Facts. Because the defendant challenges the sufficiency of the evidence presented with respect to the charges of stalking and criminal harassment, we summarize the facts the jury could have found in the light most favorable to the Commonwealth. See Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). We reserve certain facts for further discussion in connection with other issues raised.

The defendant met the victim,[2] an elementary school teacher in Rhode Island, in the late 1990s or early 2000s. They began dating and later bought a house together in Rhode Island where they lived for about three years. During that time, the defendant asked the victim multiple times to marry him; she initially refused but eventually agreed to become engaged. However, they made no wedding plans and never married.

In May, 2006, the defendant and the victim jointly purchased a new home in Seekonk, Massachusetts (Seekonk house). The Seekonk house had four bedrooms and a finished basement, and was located on one and one-half acres of land. There were two sheds on the property as well as a driveway and a garage.

_____

Anti-Defamation League; and the American Civil Liberties Union of Massachusetts.

[2] In accordance with G. L. c. 265, § 24C, we omit the victim's name from this opinion.

On July 4, 2007, the defendant and the victim had a barbecue and invited members of each of their families.[3]  During the party, the defendant became involved in a physical altercation with the victim's son, who had been living with them.[4]  The victim, seeing this, was concerned for her son's safety, and shouted at the defendant to leave her son alone.  After the incident, the victim told the defendant that she could no longer be involved with him romantically, and returned the engagement ring he had given her.  However, the victim continued to live in the Seekonk house because she did not know where else to go, her dog and all of her belongings were there, and her personal finances were comingled with the defendant's.[5]

a.  Pattern of harassment following the breakup.  The defendant refused to accept the breakup.  Although around the beginning of August, 2007, he agreed to sell the Seekonk house, he repeatedly told the victim that there would be "repercussions" if she left him, such as that he would take

---

[3] By this point, the victim was generally unhappy in the relationship with the defendant, at least in part as a result of the defendant's attitude toward her friends and family and controlling behavior.

[4] The victim's daughter also lived at the Seekonk house for at least a few months in 2007.

[5] The victim's son moved out of the Seekonk house after the incident on July 4, 2007, but her daughter continued living in the house until September, 2007.

their dog and she would never see it again.  He also told her that he was "keeping a file" on her, and would often go into their computer room, say that he was "adding to the file," and shut the door.  In addition, the victim began to notice more often that the defendant was appearing unexpectedly in places outside the home that she went on her own, such as a craft store and a work-related conference.  The defendant also insisted on accompanying the victim to a gymnasium, and when she told him she did not want him to come, he would wait near or in her vehicle when she came home from work.  During this period, the victim slept with a cellular telephone under her pillow, so that she could make a call immediately if she had to, and to prevent the defendant from gaining access to her telephone in order to see to whom she had been talking.

The defendant told the victim that he had been a sniper in the military, and he kept guns in the home.  Prior to July 4, 2007, the victim rarely saw the defendant's guns, but after that date, she began to see them more often.  Sometimes, she saw the defendant sitting on a stump in the backyard with a rifle.  In November, 2007, the victim came home and saw the defendant cleaning a gun on the coffee table in the living room.  At least three times, the victim also heard the defendant say, "[O]ne shot, one kill," although he did not say it directly to her.

Seeing the defendant's guns made the victim feel scared and threatened.

On Christmas Day, 2007, the victim went home briefly from her father's house, where she had been spending the holiday, to retrieve some forgotten presents. The defendant was sitting at the coffee table with a gun, and there was another gun on the stairs. The victim felt afraid; she retrieved the presents and left without speaking to the defendant. When she returned home later that evening, the defendant yelled at her for not having spent Christmas with him. The victim said that she was leaving, ran out of the house, and drove less than one mile to a corner store, where she sat in her automobile and telephoned her father. While on the telephone, she saw the defendant pull up near her in his truck. She tried to lock her vehicle's doors, but the defendant jumped into her vehicle and tried to wrestle her telephone away while shouting and cursing at her. Another vehicle pulled up next to her's; the defendant got out and seemed to drive away. When the victim ultimately drove home to the Seekonk house, she discovered that she had been locked out. She then telephoned the police, who escorted her into her house to get some of her belongings; she spent that night at her father's home. Two days later, on December 27, 2007, the victim obtained an abuse prevention order pursuant to G. L. c. 209A (restraining order), requiring the defendant immediately to

leave and stay away from the Seekonk house, and to remain at least one hundred yards away from her. The restraining order was served on the defendant, the defendant left the house, and the victim moved back in.

The defendant had a construction business and kept equipment related to this business on the Seekonk property. This equipment included a number of large items, including a trailer and an excavator. In order for the defendant to access his equipment, on December 31, 2007, at the defendant's request and with the victim's assent, a District Court judge modified the restraining order to allow the defendant "access to the garage area between 7:45 A.M. and 4:00 P.M.[,] Monday through Friday."[6]

Around December, 2007, the victim began dating a sergeant in a Rhode Island police department whom we shall call "Stephen."[7] The victim and Stephen had been friends for approximately four years prior to that point, but the relationship did not become romantic until then. Nevertheless, from July 4, 2007, onward, the defendant frequently accused the victim of having an affair with Stephen. On the evening of

_____

[6] The restraining order remained in effect, with other modifications to be discussed infra, until April 9, 2009.

[7] The victim married Stephen in November, 2008.

January 14, 2008, the victim and Stephen were sitting in the victim's father's house, when the victim saw the defendant in her father's front yard. The victim and Stephen got into a vehicle and drove away from the house looking for him. When they caught up to him, Stephen and the defendant shouted at each other, and the defendant accused Stephen of "tagging" the victim for years.

In February, 2008, the victim came home one day and discovered that the defendant's excavator, which previously had been parked on land to the right of the Seekonk house, had been moved so that it was now blocking access to one of the two sheds, and the victim was unable to move it. Around the same time, she also discovered that the doors to the other shed had been screwed and hammered shut, which had never been the case before.[8] Around the end of February, the victim found the defendant's trailer at the end of her driveway. The trailer was blocking the entrance to the driveway, and was inoperable. For a time, she could still access the garage by driving to another part of the property and then across the lawn.[9] However, shortly

---

[8] The first shed contained some of the victim's gardening tools and other items, while the second shed contained the house's recycling bins.

[9] Before the trailer was left in the driveway, the Seekonk property had cement blocks on either side of the driveway, as well as a row of taller blocks along the front of the property.

after the trailer began blocking the driveway, several boulders that were too large to have been placed by hand appeared on the property, preventing her access to the garage even by driving across the lawn.[10]  A sign that read "Michael J. Walters Inc., General Excavation Contracting," and that had never been on the property before, also appeared.  After that, around March, 2008, the victim found another piece of the defendant's heavy equipment in the garage, blocking the space where she would normally park her vehicle.  Throughout this time, the restraining order remained in effect.

On another night in March, 2008, the victim discovered that the light bulbs had been removed from all of the lights on the outside of the Seekonk house.  There were no other lights illuminating the path from the driveway to the door of the house, nor were there any streetlights, causing the area to be dark at night and stress for the victim.  The defendant admitted to a Seekonk police officer that he had unscrewed the light bulbs because the lights were being left on twenty-four hours

_____

These blocks prevented the victim from simply driving around the side of the trailer and back onto the driveway.

[10] The defendant's placement of these boulders on the Seekonk property was the basis for one of the two convictions of violating the restraining order.

per day, the electricity bill was still in his name, and he did not want to have to pay for unnecessary electricity.[11],[12]

A real estate agent had created a page on a Web site, called Zillow, to advertise that the Seekonk house was for sale. The victim visited the page and discovered that the defendant had posted a copy of her affidavit in support of her request for the restraining order, but the affidavit contained additional information that she had not included in the original, such as that the victim had "mixed thyroid medication and wine."  The affidavit was posted immediately after the victim obtained the restraining order, in December, 2007.  In the months that followed, the victim saw other posts on Zillow that disparaged her or Stephen.[13]  Other posts referenced subject matter that the

---

[11] The defendant's removal of the light bulbs from the exterior of the house was the subject of the other restraining order violation.

[12] From December 27, 2007, until approximately June, 2008, the victim was not receiving mail at the Seekonk house, including household bills.  At least some of these bills remained in the defendant's name; however, the victim attempted to have the bills changed to her name.  She also contacted the post office regarding the problem with her mail but received no explanation for it and eventually arranged to have her mail delivered to her father's house.

[13] For example, at least one post referred to her as an "adulteress," and another suggested that she had "[b]ipolar [e]pisodes."  Another post referred to observations that Stephen's vehicle had been driven across the lawn and parked in the garage at the Seekonk house multiple times over the weekend

victim and Stephen had discussed in private electronic mail messages (e-mails) to one another.[14]  The defendant had access to the Zillow page and admitted to having made the posts.[15] Although the posts do not indicate the date that they were uploaded to the Web site, they appear to have been posted no later than April 6, 2008.

On March 4, 2008, following a hearing at which the defendant did not appear, a District Court judge reinstated in its entirety the original restraining order requiring the defendant to leave and stay away from the Seekonk house.  On March 10, the victim and Stephen went to the court for a follow-up hearing regarding the order.  As they pulled into the court parking lot, the defendant got out of a large vehicle with a camera in his hand.  Other people also got out of the vehicle, including a woman named Cynthia Dugas and two of the defendant's sons.  The defendant handed the camera to one of his sons, who

---

of February 29 to March 2, 2008, and suggested that art was missing from the home.

[14] The victim had not shared her electronic mail (e-mail) password with the defendant or otherwise permitted him to access her e-mail account.

[15] There also were several posts pertaining to the victim or to Stephen on another Web site, called MySpace, which is used for social networking.  See Commonwealth v. Williams, 456 Mass. 857, 867 (2010).  The last of these posts that were admitted as evidence at trial were posted no later than April 2, 2008.

began to chase the vehicle that the victim and Stephen were in.[16] The victim was so nervous during this incident that she initially did not get out of her vehicle at the court, but instead drove away from the location. Ultimately, however, a hearing was held that day at which both the victim and the defendant appeared. The restraining order was extended until April 10, 2008, and the defendant was given five days to pick up his construction equipment, but was not permitted to enter the house.

Around the same time,[17] the defendant arranged for Dugas to view the inside of the house, supposedly so that Dugas could determine whether it was handicap-accessible and would be suitable to purchase for her mother, who was ill. The defendant drove Dugas to the property and waited for her while she was inside.

On June 6, 2008, the defendant was granted seven business days, beginning on June 9, to enter the Seekonk house, in the presence of police, in order to remove his personal possessions.

---

[16] The jury were instructed that they were to consider only the defendant's actions in relation to this incident, and not the actions of the defendant's sons.

[17] Although the record is unclear as to whether Cynthia Dugas viewed the inside of the Seekonk house before or after March 4, 2008, when the original restraining order was reinstated in its entirety, her testimony suggests that she viewed the property at some point close to this date.

The defendant made at least three trips to the property to do this.  On June 10, police observed a woman who was with the defendant taking pillows and blankets from the house that appeared to have been just removed from a bed; they were not in a box or otherwise packed.  On June 11, the defendant removed other belongings, including a television and chairs.  Finally, on June 17, police observed the defendant entering and leaving the house five to eight times, and eventually removing large pieces of furniture and appliances.  When the victim returned home that day, she discovered that the refrigerator, stove, and bed had been removed, and the water for the whole house had been shut off.  Urine and feces had been left in the toilets, which could not be flushed because the water was off.  When the water was turned on, water began shooting out of a pipe where the refrigerator had been, requiring the victim to turn it off again until that problem could be fixed.  There was also food from the refrigerator placed in the sink and on the counters, items on the floor, and no towels with which to clean up the mess.[18]

Shortly thereafter, the victim moved out of the Seekonk house.  Accordingly, in November, 2008, the restraining order was again modified to allow the defendant to return to the

---

[18] Within approximately one month, the refrigerator and the stove were left in the victim's attorney's parking lot.

property.  On April 9, 2009, the order was vacated because the victim had moved to Rhode Island.

b.  Defendant's Facebook profile.  No evidence was admitted regarding the defendant's conduct toward the victim from June, 2008, until January, 2011.  On January 13, 2011, Stephen, against whom the defendant previously had filed a number of complaints with the police department where he worked, learned that the defendant had sent e-mails to a member of the city council asking that Stephen be investigated.  This made Stephen concerned that the defendant might resume posting material related to the victim on Web sites, so Stephen searched for and viewed the defendant's Facebook profile.[19]  The profile page featured a photograph of the defendant, seated in a room, with a

_____

[19] Facebook is also a social networking Web site.  See Commonwealth v. Purdy, 459 Mass. 442, 450 (2011); In re Zynga Privacy Litig., 750 F.3d 1098, 1100 (9th Cir. 2014).  The site allows members to "develop personalized web profiles to interact and share information with other members." Lane v. Facebook, Inc., 696 F.3d 811, 816 (9th Cir. 2012), cert. denied sub nom. Marek v. Lane, 134 S. Ct. 8 (2013).  "The type of information members share varies considerably, and it can include news headlines, photographs, videos, personal stories, and activity updates.  Members generally publish information they want to share to their personal profile, and the information is thereby broadcasted to the members' online 'friends' (i.e., other members in their online network)." Id.  "Users can make their profiles available to the public generally, or limit access to specified categories of family, friends, and acquaintances." In re Zynga Privacy Litig., supra at 1101.  The defendant's Facebook profile was apparently public, because Stephen was able to view it after searching for it.

slight smile on his face, holding a large gun across his lap. On a separate part of the page, next to an information box marked "Favorite Quotations," was the following statement: "Make no mistake of my will to succeed in bringing you two idiots to justice." The page also indicated that the defendant was a committee member of the "Governors [sic] Task Force on Police Corruption" and included images of the singer Rihanna and of a St. Louis Rams helmet. The photograph of the defendant holding a gun appeared to have been uploaded to the page on January 13, the same day that Stephen searched for and found the page,[20] but it was unclear when the other items were added. When the victim saw the Facebook page, it made her feel terrified.[21]

2. Procedural history. On March 28, 2011, a grand jury indicted the defendant for stalking, in violation of § 43 (a); criminal harassment, in violation of G. L. c. 265, § 43A; criminal violation of an order pursuant to G. L. c. 209A, § 7 (two counts); and perjury, in violation of G. L. c. 268, § 1

---

[20] The trial record is ambiguous as to the specific year that the photograph was added to the defendant's Facebook page. However, the Commonwealth asserted at oral argument that the evidence suggested the photograph was uploaded on January 13, 2011, and the defendant agreed.

[21] In early 2011, the defendant filed civil lawsuits in Rhode Island, one against the victim and one against Stephen.

(two counts).[22]  The charges of stalking, criminal harassment, and violations of the restraining order identified the victim as the sole target of these crimes.

The defendant was tried before a jury in 2012.  At the close of the Commonwealth's case-in-chief, the defendant moved for a required finding of not guilty on all charges except one of the charges of violating the restraining order; these motions were denied.  The jury convicted him of the stalking, criminal harassment, restraining order violations, and perjury charges.  The defendant appealed.  We transferred the appeal to this court on our own motion.[23]

Discussion.  1.  Stalking.  A person is guilty of stalking if he or she " (1) willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person which seriously alarms or annoys that person and would cause a reasonable person to suffer substantial emotional distress, and (2) makes a threat with the intent to place the person in imminent fear of death or bodily injury"; the conduct, acts, or threats may be accomplished by

---

[22] The defendant also was indicted for rape and indecent assault and battery of the victim.  The jury found him not guilty of these charges.

[23] The defendant represented himself at trial, with the assistance of stand-by counsel.  On appeal, he is represented by counsel.

means of electronic communication.[24] G. L. c. 265, § 43 (a).

The defendant challenges the sufficiency of the evidence presented with respect to both the "threat" and "pattern of conduct or series of acts" components of stalking. We focus on the threat component.

The Commonwealth contends that the defendant's Facebook page containing the photograph of himself holding a gun, and, in a space labeled "[f]avorite [q]uotations," the words, "Make no mistake of my will to succeed in bringing you two idiots to justice," satisfied the threat element set out in § 43 (a) (2).[25]

---

[24] General Laws c. 265, § 43 (a), as amended through St. 2010, c. 92, § 9 (§ 43 [a]), provides in relevant part:

"Whoever (1) willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person which seriously alarms or annoys that person and would cause a reasonable person to suffer substantial emotional distress, and (2) makes a threat with the intent to place the person in imminent fear of death or bodily injury, shall be guilty of the crime of stalking and shall be punished . . . . The conduct, acts or threats described in this subsection shall include, but not be limited to, conduct, acts or threats conducted by mail or by use of a telephonic or telecommunication device or electronic communication device including, but not limited to, any device that transfers signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photo-electronic or photo-optical system, including, but not limited to, electronic mail, internet communications, instant messages or facsimile communications."

[25] During the trial, the jury were instructed to consider only the Facebook profile page in determining whether the

The defendant disagrees, arguing that because the Facebook page was ambiguous and temporally remote from the alleged harassment, the First Amendment to the United States Constitution dictates that the page could not qualify as a "threat" under § 43 (a) (2), but was instead protected speech. We agree with the defendant's contention that there was insufficient evidence for a rational jury to find that the defendant made such a threat. See Latimore, 378 Mass. at 677-678.

We begin with the requirements of the First Amendment.[26] Generally speaking, laws that proscribe speech based on its content are presumptively invalid. R.A.V. v. St. Paul, 505 U.S. 377, 382 (1992). Nevertheless, "certain well-defined and narrowly limited classes of speech," O'Brien v. Borowski, 461 Mass. 415, 422 (2012), quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 571, 572 (1942), do not receive constitutional protection, including "true threats." O'Brien v. Borowski, supra. See Virginia v. Black, 538 U.S. 343, 359 (2003); Watts

---

defendant had made a "threat" against the victim under § 43 (a) (2).

[26] Both the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments to the Massachusetts Constitution, generally protect speech from government regulation. See O'Brien v. Borowski, 461 Mass. 415, 422 (2012). Neither party suggests that a separate analysis of this issue is necessary under each of these constitutional provisions.

v. United States, 394 U.S. 705, 708 (1969).  See also United States v. Alvarez, 132 S. Ct. 2537, 2544 (2012) (plurality opinion) (listing "true threats" as among "historic and traditional" categories of unprotected speech [citations omitted]).

The United States Supreme Court has defined "true threats" as

> "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . .  The speaker need not actually intend to carry out the threat.  Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'" (Citation omitted.)

Black, 538 U.S. at 359-360, quoting R.A.V. v. St. Paul, 505 U.S. at 388.  A "true threat" need not take the form of an explicit statement that the speaker intends to cause imminent, physical harm to the victim, but may comprise "words or actions that -- taking into account the context in which they arise -- cause the victim to fear such harm now or in the future."  O'Brien v. Borowski, 461 Mass. at 425.  See Black, supra at 362-363 (State may prohibit cross burnings committed with intent to intimidate); Commonwealth v. Chou, 433 Mass. 229, 234-235 (2001) ("sexually explicit and aggressive language" targeting individual victim may constitute threat absent explicit statement of intention to harm victim as long as circumstances

reasonably support victim's fearful response); Commonwealth v. Robicheau, 421 Mass. 176, 179, 182-183 (1995) (defendant's verbal threats not protected under First Amendment). Conversely, speech that has an expressive purpose other than to instill fear in another may be explicitly threatening, but may nevertheless fail to rise to the level of a true threat. Watts, 394 U.S. at 706, 708 (statement at political rally was, given its context, "political hyperbole" and not "true threat"); Chou, supra at 237.

Comparing the definition of "true threat" to the threat component of the stalking statute, we conclude that any verbal or written communication that qualifies as a threat as defined in the statute is also a "true threat," and therefore is not entitled to protection under the First Amendment.[27] To convict a defendant of stalking, the Commonwealth must show that he or she

---

[27] Other categories of unprotected speech may encompass acts of speech that are punished under the other component of stalking, namely, the "pattern of conduct or series of acts" directed at another. G. L. c. 265, § 43 (a) (1). See Commonwealth v. Welch, 444 Mass. 80, 87-88, 98-99 (2005), abrogated on another ground by O'Brien v. Borowski, 461 Mass. at 425 & n.7 (criminal harassment statute, G. L. c. 265, § 43A, is "closely related" to criminal stalking statute; where harassment includes "fighting words" not protected by First Amendment, statute may penalize this conduct). See also Commonwealth v. Johnson, 470 Mass. 300, 310 (2014) (where defendant's speech was "integral to criminal conduct" of harassing and causing substantial emotional distress to victims, speech could be penalized as criminal harassment in violation of G. L. c. 265, § 43A [a] [citation omitted]).

"[made] a threat with the intent to place the [stalking target] in imminent fear of death or bodily injury." G. L. c. 265, § 43 (a) (2). Thus, like "true threats," see Black, 538 U.S. at 359-360, the threat component of the stalking statute specifically targets communications by the defendant that are aimed at placing the victim in fear of physical violence, whether or not the defendant actually intends to commit the threatened act of violence. See Commonwealth v. Matsos, 421 Mass. 391, 395 (1995) (to prove threat in furtherance of stalking, "Commonwealth need not prove that the defendant actually intended to harm the victim . . . [;] it need only prove that the defendant's threats were reasonably calculated to place the victim in imminent fear of bodily injury" [citation omitted]). See also Commonwealth v. Gupta, 84 Mass. App. Ct. 682, 687 (2014) (stalking statute "aims to protect victims of stalking from fear itself, and not merely ultimate physical harm"). In addition, the threat component of stalking has been likened to assault, see Matsos, supra at 394-395; clearly, speech that constitutes an assault or that similarly threatens another does not enjoy First Amendment protection. See Robicheau, 421 Mass. at 183 (denying First Amendment protection to verbal threats that placed victim in "reasonable apprehension of imminent serious physical harm").

As with an assault, for a defendant to make a threat that meets the requirements of § 43 (a) (2), both the defendant must intend to place the victim in immediate fear that physical harm is likely to occur and the victim's fear must be reasonable.[28] See Matsos, 421 Mass. at 394-395.  See also Commonwealth v. Gorassi, 432 Mass. 244, 248 (2000) (to commit assault, defendant must engage in "objectively menacing" conduct with intent to place victim in fear [citation omitted]).  The reasonableness of the victim's fear depends in part on "the actions and words of the defendant in light of the attendant circumstances" (citation omitted).  Matsos, supra at 395.  See Gupta, 84 Mass. App. Ct. at 684, 688 (victim's "imminent fear" based on defendant's long-distance telephone calls reasonable in light of defendant's "mobility, history of abusive conduct, motivation," and knowledge of victim's whereabouts).  Similarly, "[i]ntent is a factual matter that may be proved by circumstantial

---

[28] We note that the threat element of the crime of stalking differs from the common-law crime of assault in one important respect:  unlike assault, which requires that the defendant act "with the intent to put the victim in fear of immediate bodily harm," Commonwealth v. Gorassi, 432 Mass. 244, 248 (2000), for a threat to meet the requirements of the stalking statute, it need not necessarily cause the victim to fear that physical harm will come to him or her immediately.  See Commonwealth v. Gupta, 84 Mass. App. Ct. 682, 685, 686-687 (2014) (observing that G. L. c. 265, § 43 [a] [2], requires threat that places victim in "imminent fear of death or bodily injury," rather than in fear of "imminent death or bodily injury," and that prior cases have been consistent with this reading).

evidence."[29]  Commonwealth v. LaPerle, 19 Mass. App. Ct. 424, 427 (1985), quoting Commonwealth v. Ellis, 356 Mass. 574, 578-579 (1970).

Finally, although communication of a threat to its intended victim is not expressly required under § 43 (a) (2), we agree with the Appeals Court that evidence of the defendant's intent to communicate the threat through direct or indirect means is necessary.  See Commonwealth v. Hughes, 59 Mass. App. Ct. 280, 281-282 (2003).  Where communication of the threat is indirect -- for example, through an intermediary -- the Commonwealth must prove beyond a reasonable doubt that the defendant intended the threat to reach the victim.  See id. at

---

[29] Where a defendant has been charged with threatening to commit a crime, see G. L. c. 275, § 2, based on an ambiguous statement or writing, we have similarly analyzed the substance of the communication as well as the surrounding context to determine whether the communication expressed an intent to harm the recipient and caused that person reasonable fear.  See Commonwealth v. Milo M., 433 Mass. 149, 154-155 (2001) (two drawings depicting defendant pointing gun at his teacher constituted expression of intent to harm teacher, where drawings contained other references to violence and defendant presented drawings to teacher in angry and defiant manner); Commonwealth v. Sholley, 432 Mass. 721, 725-726 (2000), cert. denied, 532 U.S. 980 (2001) (defendant's rage at court system, recent predictions of "war" and "bloodshed," angry tone, and position only inches from prosecutor when pointing his finger in her face and telling her to "watch out" permitted jury to conclude statement intended as threat); Commonwealth v. Elliffe, 47 Mass. App. Ct. 580, 582-583 (1999) (words "drop the charges," uttered while defendant was physically assaulting and battering victim, permitted jury to infer that if victim did not "drop the charges," additional violence would follow).

283 (jury could have found that defendant intended his brother to convey threat to victim). Compare Commonwealth v. Meier, 56 Mass. App. Ct. 278, 279-282 (2002) (defendant's letter to victim indicating belief that victim was responsible for recent collection efforts against defendant, combined with threatening statement to collection attorney regarding victim, supported inference that defendant intended statement to reach victim), with Commonwealth v. Troy T., 54 Mass. App. Ct. 520, 527-528 (2002) (where third party overheard putative threat, but there was no evidence of defendant's intent that third party would hear threat, jury could not infer intent to communicate threat to target).

Applying these principles to the defendant's Facebook profile page, although the victim testified that she was terrified when she viewed the page, her subjective reaction is not the crux of the inquiry. Rather, it is necessary to focus on the content of the page in the context of the past and present relationship between the defendant and the victim to determine whether there was sufficient evidence of the defendant's intent to threaten the victim and whether the victim's fear was reasonable.

We begin by considering the photograph of the defendant holding a gun. The photograph itself contains no evidence of the defendant's intent to commit violence -- there is nothing

obviously menacing about his facial expression in the photograph or the way in which he is depicted holding the gun across his lap, nor is there a caption of any kind that might suggest the photograph was intended to evoke violence.  Contrast Commonwealth v. Milo M., 433 Mass. 149, 154-155 (2001) (threatening drawings portrayed violent acts directed at defendant's teacher).  Even considering the photograph in light of the defendant's previous behavior around the victim involving guns, although his past actions might imply an intent to use guns to intimidate the victim, there was no evidence that the defendant had ever used a gun for a violent purpose in her presence, pointed a gun at her, or otherwise threatened physical violence toward her.[30]  Moreover, because the photograph was uploaded to the Facebook page in 2011, approximately three years after the last time that the victim saw the defendant with a gun, the relationship between the defendant's past behavior and the photograph is tenuous, especially considering that, given the defendant's status as a military veteran and apparently long-standing interest in guns, he could have intended the photograph to serve as an expressive statement regarding this

---

[30] The victim did testify that the defendant raped and committed an indecent assault and battery on her; however, the jury apparently did not credit this testimony, because they found the defendant not guilty of the charges stemming from these incidents.

status and interest.  Contrast Chou, 433 Mass. at 235-237 (threatening poster identified victim, contained sexually aggressive language directed at her, and had no expressive purpose other than to place victim in fear); Commonwealth v. Sholley, 432 Mass. 721, 724, 726 (2000), cert. denied, 532 U.S. 980 (2001) (defendant's actions that contributed to finding intent to threaten took place within two- to three-minute span).

Turning to the quotation on the page, "[m]ake no mistake of my will to succeed in bringing you two idiots to justice," in the circumstances of this case, it is reasonable to interpret the "two idiots" as referring to the victim and Stephen.  But even if one reads the sentence in combination with the photograph of the defendant, any particular violent message that might be attributed to the defendant from the presence of these two elements on the same page is speculative.  Although the photograph depicts the defendant holding a gun, nothing else about that image suggests a clear intent to commit violence.  Furthermore, like the photograph, the word "justice" is amenable to a reasonable, nonviolent interpretation, namely, that the defendant intended to pursue whatever legal means might be available to right wrongs he perceived the victim and Stephen had inflicted on him.  See note 21, supra.

Finally, the Commonwealth asserted during oral argument that, given the limited total number of items on the defendant's

Facebook profile page, the combined presence of (1) the photograph of the defendant with a gun, (2) the quotation about justice, (3) the reference to Rihanna,[31] and (4) the reference to the "Governors [sic] Task Force on Police Corruption,"[32] suggested that the page could have had little meaning except to project the appearance of a threat against the victim and Stephen.  We agree that the page as a whole could have come across as vaguely ominous or disturbing.  However, because no evidence was introduced at trial regarding the defendant's opinion of or even knowledge about Rihanna, or about whether the defendant did or did not participate in a task force on police corruption, we question whether it is reasonable to ascribe to these items the meaning that the Commonwealth suggests, and to then infer that the defendant in fact created and intended to use the page to place the victim in imminent fear of bodily

---

[31] Rihanna is a well-known singer and is a survivor of domestic violence, a fact that at least some members of the jury may have known.  See Sisario, Stormy Relationship, Forgiving Followers, N.Y. Times, Apr. 28, 2013.  In addition, it appears that the copy of the Facebook page that was submitted to the jury as an exhibit contained a handwritten note that identified Rihanna as a survivor of domestic violence.  The defendant did not object to admission of the copy of the page as an exhibit, and he does not raise the handwritten note as an issue on appeal.

[32] The Commonwealth argued that the reference to the defendant's participation in a task force on police corruption should be interpreted as invoking the defendant's history of filing complaints against Stephen with the police department.

harm.  Ultimately, based on the trial record, we conclude that the evidence of the defendant's intent concerning the creation of the Facebook profile was insufficient with respect both to whether the page constituted a threat within the scope of § 43 (a) (2), and to the reasonableness of the victim's fear.[33]

There is no question that new technology has created increasing opportunities for stalkers to monitor, harass, and instill fear in their victims, including through use of Web sites.  See Fraser, Olsen, Lee, Southworth, & Tucker, The New

---

[33] We comment briefly on whether there was sufficient evidence that the defendant intended to communicate the contents of this page to the victim.  No evidence was presented at trial that the defendant had used the Internet to harass or disparage the victim from April, 2008, to January 13, 2011; that either the victim or Stephen previously had communicated with the defendant via Facebook or viewed his page; or that the defendant and the victim had an overlapping network of Facebook "friends," such that information the defendant posted to his own Facebook page would have been visible to the victim's friends.  At the same time, however, the page apparently was accessible to the public, and there was substantial evidence that the defendant had used other Web sites, namely, Zillow and MySpace, to disparage the victim in the past.  We do not need to decide this issue regarding intent to communicate in the present case.  But given the relative ease with which material on the Internet can be broadcast to a wide audience, including not only to the victim but also to the victim's family, friends, coworkers, and acquaintances, the factors just mentioned -- whether the threat was conveyed in a public or private Internet space, whether the victim or others in his or her social circle was likely to see the threat, and whether the victim and the defendant had communicated online before -- will likely be important in future cases involving alleged Internet-based threats.

Age of Stalking:  Technological Implications for Stalking, 61 Juv. & Fam. Ct. J. 39, 41, 46-48 (Fall 2010) (discussing uses of Internet to cause physical harm, threaten, or post damaging information about a victim).  Where a defendant has posted a threat to a Facebook page that meets the requirements of § 43 (a) (2), and has engaged in a series of acts or pattern of conduct described in § 43 (a) (1), the fact that the threat appears on the Internet is not a barrier to prosecution for stalking.  See G. L. c. 265, § 43 (a) (2) ("conduct, acts, or threats" related to stalking may be accomplished by means of electronic communication, including Internet communications).  Cf. Elonis v. United States, 135 S. Ct. 2001, 2016-2017 (2015) (Alito, J., concurring in part and dissenting in part) (applying "true threats" exception to First Amendment to violent statements made on social media that are pointedly directed at victims, whether made recklessly or with intent to threaten); Commonwealth v. Johnson, 470 Mass. 300, 312-313 (2014) (where defendants used Web site to recruit others to harass victims, defendants could not "launder their harassment of the [victims] through the Internet to escape liability" for criminal harassment under G. L. c. 265, § 43A).  Here, however, there was

insufficient evidence that the defendant intended to make such a threat, and thus his conviction of stalking cannot stand.[34,35]

---

[34] Because the Commonwealth failed to present sufficient evidence to prove that the defendant threatened the victim within the meaning of § 43 (a) (2), ordinarily, we would next consider whether the stalking conviction could be reduced to criminal harassment. See O'Brien v. Borowski, 461 Mass. at 420 n.5 (criminal harassment, as defined in G. L. c. 265, § 43A [a], is a lesser included offense of criminal stalking); Commonwealth v. Kulesa, 455 Mass. 447, 451 n.6 (2009), citing Welch, 444 Mass. at 87, 88 (criminal harassment is "closely related" to criminal stalking, "employing nearly identical language but eliminating the threat requirement"). However, we also agree with the defendant that there was insufficient evidence to support all the specific acts on which the Commonwealth relied to prove the "pattern of conduct or series of acts" component of the stalking charge, which, like criminal harassment, requires proof of three or more incidents to support a conviction. See Welch, supra at 89-90; Commonwealth v. Kwiatkowski, 418 Mass. 543, 548 (1994). See also G. L. c. 265, § 43 (a) (1); G. L. c. 265, § 43A (a). In particular, under the judge's instructions, the jury were permitted to consider, as one of the incidents of stalking, whether the defendant (and not one of his sons, see note 16, supra) "approached" the victim with a camera outside of court; the testimony, however, was only that the defendant "got out of the car, the vehicle, and he had a camera in his hand," not that he approached the victim. Because there was insufficient evidence of this act, and we have no way of knowing whether or not the jury relied on this act in finding the defendant guilty of stalking, the defendant's stalking conviction cannot be reduced to criminal harassment and must instead be set aside. See Commonwealth v. Vizcarrondo, 427 Mass. 392, 398 (1998), S.C., 431 Mass. 360 (2000).

In addition, because we are affirming the defendant's conviction of criminal harassment, and the acts that supported the criminal harassment conviction were part of the same over-all "pattern of conduct" that supported the stalking charge, we have concerns that reducing the defendant's stalking conviction to a second conviction of criminal harassment -- or allowing the defendant to be retried on a second charge of criminal harassment based on the acts that supported the stalking charge in this trial -- would violate double jeopardy principles.

2. <u>Criminal harassment</u>. The defendant challenges the sufficiency of the evidence presented in support of his criminal harassment charge. Criminal harassment is defined as "willfully and maliciously engag[ing] in a knowing pattern of conduct or series of acts over a period of time directed at a specific person, which seriously alarms that person and would cause a reasonable person to suffer substantial emotional distress." See G. L. c. 265, § 43A (<u>a</u>). As with stalking, for a defendant to be convicted of criminal harassment, the Commonwealth must prove that the defendant engaged in at least three harassing incidents directed at the victim. See <u>Commonwealth</u> v. <u>Welch</u>, 444 Mass. 80, 89 (2005), abrogated on another ground by <u>O'Brien</u> v. <u>Borowski</u>, 461 Mass. at 425 & n.7. See also G. L. c. 265, § 43 (<u>a</u>) (1); G. L. c. 265, § 43A (<u>a</u>).

In her instructions to the jury on criminal harassment, the judge identified four alleged acts that the jury could consider in determining whether the defendant's conduct met the requirements for that offense: (1) bringing Cynthia Dugas to

---

[35] The defendant also challenged the ability of Massachusetts courts to exercise jurisdiction over him for purposes of the stalking charge, because by the time the victim and Stephen viewed the defendant's Facebook profile, they were living in Rhode Island, and they viewed the Facebook page there. The defendant appears to have been living in Rhode Island at that time as well. Given our conclusion, we do not address the jurisdictional issue.

the Seekonk house and waiting for her "while she viewed the residence with the purpose of having her check the contents of the home and check up on [the victim]"; (2) placing a sign on the Seekonk house lawn; (3) turning off the water and defecating and urinating in the toilets; and (4) leaving firearms around the house and cleaning them in the victim's presence in an intimidating manner.[36]  The defendant challenges the sufficiency of the evidence of the first two of these incidents.  His challenge fails.

With respect to the sign that was placed on the Seekonk house lawn, the defendant argues that he was entitled, under the First Amendment, to advertise his construction business on his property.  See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 770 (1976) (First Amendment protection of commercial speech).  The general principle he states is correct, but here, the defendant placed the sign alongside one of the cement blocks that was on the property, so that it also impeded vehicle access.[37]  Based on the

---

[36] The jury were instructed to consider a different eight of the defendant's other alleged acts of harassment directed toward the victim as part of the stalking charge.

[37] The defendant argues that the sign was "small" and did not block the victim's access to the property or could have been moved.  However, the victim testified that it did impede her access, and we evaluate the sufficiency of the evidence in the light most favorable to the Commonwealth.

location of the sign and the fact that it never had been displayed on the property before, the jury reasonably could have inferred that the purpose of the sign was to harass the victim and to remind her of the defendant's presence, rather than to engage in commercial speech.  See Johnson, 470 Mass. at 309 (where sole purpose of defendants' speech was to harass victims, speech was not protected by First Amendment).

With respect to the alleged act of harassment involving Dugas, the defendant argues that there was no evidence he brought Dugas to the Seekonk house for the purpose of having her check on the victim.  Although there was no express testimony on this point, considering the evidence in the light most favorable to the Commonwealth, the jury reasonably could have inferred from the testimony of Dugas, the victim, and Stephen that Dugas's purpose was to make observations not just of the house but of the victim's presence in it.  Dugas accompanied the defendant during other incidents in which the defendant or one of his sons harassed the victim or interfered with her enjoyment of the Seekonk house.[38]  The jury reasonably could infer based on

---

[38] Dugas was with the defendant outside the District Court on March 10, 2008, when one of the defendant's sons chased the victim with a camera; was with him when he removed the light bulbs from the outside of the Seekonk house; and later helped the defendant remove the refrigerator and stove from the house. The victim and Stephen also saw Dugas one night driving back and

these incidents that Dugas knew the defendant was trying to monitor and harass the victim, and was assisting him in doing so.  As for Dugas's visit to the Seekonk house in particular, Dugas's testimony that she was thinking of buying the house for her disabled, sick mother was at best improbable given that the house was large and had at least one staircase, and that Dugas's mother eventually went to live in a nursing home.  In these circumstances, the jury reasonably could have inferred that the defendant brought her to view the inside as a way of investigating the contents of the home and what the victim was doing there while the restraining order barred the defendant himself from entering.

Although these two incidents, taken alone, might seem somewhat innocuous, the Commonwealth was required to prove only that the cumulative effect of the defendant's pattern of conduct "seriously alarm[ed]" the victim, not that each individual incident was alarming.  See Johnson, 470 Mass. at 314.  Moreover, the victim testified that seeing the defendant's firearms around their house made her feel "afraid" and "threatened," and that the mess the defendant left when he

forth in front of the victim's father's house, and eventually parking in front of the home.  Dugas's explanation of what she was doing there on that occasion -- looking for the father of an arborist she needed to hire to trim a tree in her yard -- was implausible, given, among other reasons, that it was evening and already getting dark outside.

turned off the water and left urine and feces in the toilets was part of the "most horrible time in [her] life" and was "very, very stressful." A reasonable jury could have found on this record that the defendant committed each incident alleged in support of the criminal harassment charge, as well as that the combined effect of these acts seriously alarmed the victim.

3. <u>Violations of the restraining order</u>. The defendant also challenges his two convictions of violating the restraining order. He argues that during the period when the order was modified to permit the defendant "access to the garage area between 7:45 <u>A</u>.<u>M</u>. and 4:00 <u>P</u>.<u>M</u>.[,] Monday through Friday only," the order ceased to be a true order to vacate and stay away during those hours and, therefore, violation of the order at those times was not a criminal offense. See <u>Commonwealth</u> v. <u>Finase</u>, 435 Mass. 310, 313-314 (2001) (G. L. c. 209A, § 7, criminalizes only three kinds of violations of an order: failures to vacate, to refrain from abusing plaintiff, or to have no contact with plaintiff or her minor child).[39] This argument, however, ignores the most natural reading of the order, which is that the defendant remained obligated to vacate

_____

[39] General laws c. 209A, § 7, has been amended several times since the decision in <u>Commonwealth</u> v. <u>Finase</u>, 435 Mass. 310 (2001). See G. L. c. 209A, § 7, amended by St. 2002, c. 184, §§ 113-114; St. 2003, c. 26, § 448; St. 2006, c. 418, § 1; and St. 2014, c. 260, §§ 14, 15. However, <u>Finase</u>, <u>supra</u> at 313-314, accurately described the offense in 2007 and 2008.

and stay away from the Seekonk house, with the exception that he was permitted to access the garage during the hours provided. The fact that the defendant needed to drive or walk up the driveway to reach the garage does not change the import of the order, which is properly understood to mean that the defendant was allowed to traverse the driveway to access the garage, but not otherwise to interfere with the property in ways that were not related to gaining such access. Cf. Commonwealth v. Silva, 431 Mass. 194, 198-199 (2000) (incidental contact required in order to effectuate father's right to speak to children by telephone did not permit father to violate terms of protective order by using abusive and threatening language toward father's former wife).

The defendant further argues that the trial judge committed error in her jury charge by equating the defendant's acts of placing the boulders on the Seekonk property and removing the light bulbs from outside of the house with violations of the restraining order.[40] We disagree. Given that the defendant was

---

[40] The judge instructed the jury that in order to find the defendant guilty of the restraining order violations, they were required to find: (1) that a court had issued a restraining order requiring the defendant to vacate and stay away from the Seekonk property, "except as may have been permitted by the court in the order"; (2) that the order was in effect on the date of the alleged violation; (3) that the defendant knew that the pertinent terms of the order were in effect; and (4) that the defendant "violated the stay away order by removing light

charged with two violations of a restraining order based on two specific acts, the judge's instructions were a practical and appropriate way of communicating the two charges to the jury. Considering the instruction as a whole, the judge's references to removing the light bulbs and placing the boulders did not inherently equate these actions with violations of the order, but brought home to the jury that to find the defendant guilty, they had to conclude (among other things) that the defendant "violated the stay away order" by taking those actions. There was no error.

4. Perjury. On June 20, 2008, a hearing was held at the Taunton Division of the District Court Department regarding the restraining order. The judge began the hearing by asking what items were taken from the Seekonk house when the defendant was given seven business days to remove his property from the premises. In response to allegations that the items taken included linen, towels, pillows, a refrigerator, a gas stove, and the victim's bed, the defendant stated,

> "Your Honor, you are being lied to like you wouldn't believe. Everything that is being mentioned to you right now I have witnessed the fact that that didn't occur because I stayed in the garage while other people went into the home and got these items."

bulbs from the perimeter" of the Seekonk property (first indictment) or "by placing boulders on the property" (second indictment).

Later at the hearing, the defendant said,

> "Everything that she has mentioned that was taken is a lie, everything is a lie. I have got photographs. I have sent people in in front of me to see what was in the house. The house was stripped bare of every possible item that was in the home, stripped bare. The only thing left in the house when I got there was a television set and a bedroom set which . . ." (sentence interrupted).

These comments formed the basis for the defendant's second perjury conviction. He challenges this conviction on the grounds that these statements were immaterial and that, taken in context, they were not false. We disagree.

"The crime of perjury in a judicial proceeding occurs whenever one 'willfully swears or affirms falsely in a matter material to the issue or point in question.'" Commonwealth v. Geromini, 357 Mass. 61, 63 (1970), quoting G. L. c. 268, § 1. The question whether a statement is false is subjective, "i.e., what the defendant in good faith and in fact did mean," and it is up to the jury to determine what the defendant meant when a statement alleged to be false is open to multiple interpretations. Geromini, supra at 64. Materiality with respect to perjury "means relevance in the sense that the answer might tend in reasonable degree to affect some aspect or result of the inquiry," Commonwealth v. Borans, 379 Mass. 117, 135 (1979), quoting Commonwealth v. Cerveny, 373 Mass. 345, 352

(1977), and is also a question of fact for the jury to decide. Commonwealth v. McDuffee, 379 Mass. 353, 365 (1979).

The jury in this case easily could have found that the defendant denied removing a refrigerator, linen, towels, a pillow, a gas stove, and a bed from the house, and that this statement was both false and material to the judge's inquiry at the June 20, 2008, hearing. On the materiality question, it is clear that the judge's focus at the start of the hearing was on the items the victim claimed the defendant had taken from the house, and that the defendant's statements were in response to the victim's allegations. Regarding the falsity of the defendant's statements, although the defendant did, at first, say that he waited in the garage while other people went into the home "and got these items," the second statement that "[e]verything that she has mentioned that was taken is a lie, everything is a lie" and that the house was "stripped bare of every possible item that was in the home" is most naturally interpreted as clarifying that the defendant denied having taken any of the items alleged.[41] The jury could have found that this

---

[41] We reject the defendant's suggestion that the second statement refers only to the victim's allegation that the defendant took her winter shoes. The defendant's use of the language, "[e]verything that she has mentioned that was taken is a lie, everything is a lie," and "the house was stripped bare," are more reasonably interpreted as a denial that he took any of the items mentioned, rather than one specific item.

denial was a false statement in light of the testimony that the defendant and his companions removed the refrigerator, the stove, pillows, blankets, and a bed.[42]  We therefore affirm the defendant's second perjury conviction.

5.  Prosecutorial errors.  The defendant also claims that the prosecutors committed two errors that warrant a new trial: (1) referring to a fact not in evidence during closing argument, and (2) failing to disclose potentially exculpatory evidence prior to trial.  Although we agree that these were errors, a new trial is not warranted.

a.  Reference to fact not in evidence.  "In closing argument, a prosecutor may not 'misstate the evidence or refer to facts not in evidence.'"  Commonwealth v. Joyner, 467 Mass. 176, 188-189 (2014), quoting Commonwealth v. Lewis, 465 Mass. 119, 129 (2013).  See Mass. G. Evid. § 1113(b)(3)(A) (2015).  One of the prosecutors said during closing argument that the police officer who was present on the last day that the defendant removed property from the house had testified to having seen that the water was shut off and that someone had

---

[42] The defendant also challenges his conviction on the grounds that because his second statement was cut off, he was not given a full opportunity to explain his position as to which items he took from the home.  However, we conclude that the defendant's words before he was cut off are sufficiently unambiguous that additional explanation is unnecessary in order to understand his meaning.

defecated in the toilets.  The defendant correctly asserts that the police officer did not testify to this; instead, all he said regarding the condition in which the defendant left the house was that the garage and the front door were left open.  Because the defendant did not object to this statement during trial, "we review to determine whether any error created a substantial risk of a miscarriage of justice."  Joyner, supra at 188.

The prosecutor's statement clearly attributed testimony to the officer that he did not say and was therefore improper.  However, "[r]emarks made during closing arguments are considered in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury."  Commonwealth v. Gonzalez, 465 Mass. 672, 680 (2013), quoting Commonwealth v. Whitman, 453 Mass. 331, 343 (2009).  Here, the judge instructed the jury both before and after closing arguments that the arguments of counsel are not evidence, and that, if either party referred to facts not in evidence during closing, the jury should disregard them.  The jury are presumed to have followed these instructions.  Gonzalez, supra at 681.  In addition, although the offending remark did tend to corroborate the victim's testimony regarding a particularly unpleasant fact, the comment was relatively brief, the prosecutor did not belabor the point, and other aspects of the victim's testimony, such as the removal of the refrigerator and the stove from the house, were

corroborated.  The prosecutor's misstatement was not so significant that it created a substantial risk of a miscarriage of justice.

b.  Disclosure of potentially exculpatory evidence.  Prior to trial, the defendant moved for discovery of "[a]ny and all inconsistent statements made by the complainant or any other witness for the Commonwealth," as well as other exculpatory evidence.  The motion was allowed in part, with the caveat that the form in which the Commonwealth disclosed the information was left to the Commonwealth's discretion.  On the fourth day of trial, during the defendant's cross-examination of the victim, she testified that she had created a journal in which she wrote down some of the things that had happened to her, and that she had given the journal to an investigator on the staff of the district attorney.  The defendant immediately requested a copy of the journal.[43]  After contacting the investigator, the prosecutors concluded that the victim had never given the Commonwealth any physical journal but that the victim had shared with the investigator via e-mail parts of what the victim had written in her journal.  Later that day, while the victim was still on the witness stand, the Commonwealth gave the defendant

---

[43] The defendant also requested a mistrial.  The judge did not rule on the motion.

two pages of e-mail communications from the victim to the investigator, which the victim confirmed were part of her journal.  That same day, the defendant also stated that he had received in the mail, the day before, a packet of materials from an anonymous source containing e-mails between the victim, the investigator, and an assistant district attorney who was not one of the prosecutors trying the case.[44]  When the prosecutors reviewed those materials, they asserted that the substance of what was contained in those e-mails had already been provided to the defendant by way of a police report, grand jury minutes, or otherwise.  The judge permitted the defendant to cross-examine the victim on both the fourth and fifth days of trial (a Friday and a Monday) concerning the e-mails.

The defendant now argues that the Commonwealth's delayed disclosure of the e-mails containing the victim's journal entries and other writings about the alleged incidents violated his right to due process by denying him exculpatory evidence until the middle of trial.  See Commonwealth v. Daniels, 445 Mass. 392, 401 (2005), quoting Commonwealth v. Tucceri, 412 Mass. 401, 404-405, (1992) ("Due process of law requires that the government disclose to a criminal defendant favorable

_____

[44] The source of this packet of materials was not determined during the course of the trial and is not provided in the record.

evidence in its possession that could materially aid the defense against the pending charges").  Although we have concerns regarding the timing and manner of disclosure of the e-mails, any error here does not warrant a new trial, because an examination of e-mails reveals that they are substantially more inculpatory than exculpatory.  See Commonwealth v. Healy, 438 Mass. 672, 679 (2003) (claim of failure to disclose exculpatory evidence requires proof "that the evidence was, in fact, exculpatory").  While some specific dates and details referenced in the e-mails may have conflicted with parts of the victim's testimony, and therefore may have had some minimal impeachment value, in general, the e-mails corroborate the victim's account of the defendant's treatment of her after July 4, 2007, including her accusations of rape, of which the defendant was found not guilty.  Furthermore, the defendant had time to and did incorporate questions regarding the e-mails into his extensive cross-examination of the victim.  The defendant therefore is not entitled to a new trial as a result of the delayed disclosure of the e-mails.[45]

---

[45] The defendant also briefly mentions a number of other alleged instances of prosecutorial delay.  These alleged instances, if they in fact involved delay, do not entitle the defendant to relief.

6. <u>Impeachment of Commonwealth's witness without proof of conviction</u>. The defendant argues that the trial judge committed error by declining to allow him to impeach the credibility of one of the Commonwealth's witnesses with evidence of her criminal conviction but without a certified copy of the conviction. There was no error. "In order to impeach a witness by a criminal conviction, the conviction must be proved by a court record or a certified copy." <u>Commonwealth</u> v. <u>Puleio</u>, 394 Mass. 101, 104 (1985). See G. L. c. 233, § 21; Mass. G. Evid. § 609 (2015). The defendant's status as a self-represented litigant (with standby counsel) did not exempt him from being required to comply with governing statutes and our procedural rules. See <u>Mains</u> v. <u>Commonwealth</u>, 433 Mass. 30, 35 (2000), quoting <u>Mmoe</u> v. <u>Commonwealth</u>, 393 Mass. 617, 620 (1985) (procedural "rules bind a pro se litigant as they bind other litigants").

<u>Conclusion</u>. The defendant's conviction of stalking is vacated. His convictions of criminal harassment, violation of an order issued pursuant to G. L. c. 209A, and perjury are affirmed. The case is remanded to the Superior Court for resentencing consistent with this opinion.

<u>So ordered</u>.